RICHARD D. REINBERG AND RUTH REINBERG, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 29326-83, 29997-83, 31535-83, 32938-83, 32940-83, 33395-83, 33396-83, 33398-83, 33425-83, 33426-83, 34738-83, 4284-84, 4285-84, 4286-84, 4403-84, 4446-84, 4447-84, 6720-84, 20644-84.

Filed January 25, 1988.

*Stephen L. Kadish* and *Kevin M. Hinkle,* for the petitioners.

*Richard S. Bloom* and *John H. Gadon,* for the respondent.

HAMBLEN, *Judge*: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows:

[1]Cases of the following petitioners are consolidated herewith: Leonard C. Rosenberg and Sally P. Rosenberg, docket No. 29997-83; Richard W. Pogue and Patricia R. Pogue, docket No. 31535-83; S. Sidney Zilber, a.k.a. Sidney Zilber, and Elizabeth L. Zilber, docket No. 32938-83; Beno Michel and Elaine Michel, docket No. 32940-83; Stephen L. Kadish, docket No. 33395-83; Betty J. Schur, docket No. 33396-83; John S. Allerton and Juanita L. Allerton, docket No. 33398-83; Richard B. Steuer and Jean K. Steuer, docket No. 33425-83; Dave Margolis and Thelma Margolis, docket No. 33426-83; Sol J. Roth and Harriet Roth, docket No. 34738-83; Donald P. Schneider and Elaine M. Schneider, docket No. 4284-84; S. Sidney Zilber and Elizabeth L. Zilber, docket No. 4285-84; Lawrence R. Weiss and Joan Weiss, docket No. 4286-84; Allan M. Unger and Constance Unger, docket No. 4403-84; Leonard P. Rome and Nancy G. Rome, docket No. 4446-84; Beno Michel and Elaine M. Michel, docket No. 4447-84; Byron S. Krantz and Joan L. Krantz, docket No. 6720-84; Charles P. Malitz and Gail Malitz, docket No. 20644-84.

| Docket No. | Petitioners[2] | TYE Dec. 31— | Deficiency |
|---|---|---|---|
| 29326-83 | Reinberg | 1978 | $1,490.00 |
| 29997-83 | Rosenberg | 1976 | 7,568.00 |
| | | 1977 | 7,698.00 |
| | | 1978 | 2,772.00 |
| 31535-83 | Pogue | 1976 | 22,127.00 |
| | | 1977 | 22,438.00 |
| | | 1978 | 8,924.47 |
| 32938-83 | Zilber | 1976 | 6,808.06 |
| | | 1977 | 2,945.00 |
| 32940-83 | Michel | 1976 | 1,873.00 |
| | | 1977 | 3,709.00 |
| 33395-83 | Kadish | 1976 | 6,916.00 |
| 33396-83 | Schur | 1976 | 21,213.00 |
| | | 1977 | 18,846.00 |
| 33398-83 | Allerton | 1976 | 22,236.00 |
| | | 1977 | 22,808.00 |
| 33425-83 | Steuer | 1976 | 10,866.55 |
| | | 1977 | 11,879.63 |
| 33426-83 | Margolis | 1976 | 19,221.00 |
| | | 1977 | 4,217.00 |
| | | 1978 | 2,292.00 |
| 34738-83 | Roth | 1976 | 44,025.00 |
| | | 1977 | 19,734.00 |
| | | 1978 | 8,368.00 |
| 4284-84 | Schneider | 1976 | 20,829.00 |
| | | 1977 | 11,187.00 |
| | | 1978 | 4,096.00 |
| 4285-84 | Zilber | 1978 | 2,061.00 |
| 4286-84 | Weiss | 1978 | 13,242.00 |
| 4403-84 | Unger | 1976 | 23,640.00 |
| | | 1977 | 27,468.00 |
| 4446-84 | Rome | 1978 | 4,196.00 |
| 4447-84 | Michel | 1978 | 4,169.00 |
| 6720-84 | Krantz | 1976 | 30,711.00 |
| | | 1977 | 18,609.00 |
| | | 1978 | 8,683.00 |
| 20644-84 | C. Malitz | 1976 | 14,562.00 |
| | | 1977 | 14,520.00 |
| | | 1978 | 6,811.00 |
| | | 1979 | 1,383.00 |

The deficiencies in dispute arise from petitioners' involvement in Wenles Films, Ltd. (Wenles). Wenles is an Ohio limited partnership organized to purchase and exploit the

---

[2]Gail Malitz is a party to this action only by virtue of filing a joint Federal income tax return with her husband.

rights in a motion picture based on the story "The Bluebird" by Maurice Maeterlinck. After concessions,[3] the primary issue for decision is whether petitioners, as limited partners of Wenles, are entitled to depreciation deductions for their distributive share of loss reported by Wenles and, if so, in what amounts.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts, the supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference.

Petitioners Richard D. and Ruth Reinberg resided in Pepper Pike, Ohio, when they filed their petition in this case. Petitioners Leonard C. and Sally P. Rosenberg resided in Shaker Heights, Ohio, when they filed their petition in this case. Petitioners Richard W. and Patricia R. Pogue resided in Shaker Heights, Ohio, when they filed their petition in this case. Petitioners S. Sidney, a.k.a. Sidney, and Elizabeth L. Zilber resided in Cleveland, Ohio, when they filed their petition in this case. Petitioners Beno and Elaine M. Michel resided in Pepper Pike, Ohio, when they filed their petition in this case. Petitioner Stephen L. Kadish resided in Cleveland, Ohio, when he filed his petition in this case. Petitioner Betty J. Schur resided in Beachwood, Ohio, when she filed her petition in this case. Petitioners John S. and Juanita L. Allerton resided in Annandale, Virginia, when they filed their petition in this case. Petitioners Richard B. and Jean K. Steuer resided in Shaker Heights, Ohio, when they filed their petition in this case. Petitioners Dave and Thelma Margolis resided in Cleveland Heights, Ohio, when they filed their petition in this case. Petitioners Sol J. and Harriet Roth resided in Beachwood, Ohio, when they filed their petition in this case. Petitioners Donald P. and Elaine M. Schneider resided in Chesterland, Ohio, when they filed their petition in this case. Petitioners Lawrence R. and Joan Weiss resided in Pepper Pike, Ohio, when they filed their petition in this case. Petitioners Allan M. and Constance Unger resided in

[3]Due to the agreement of the parties on certain issues, a computation under Rule 155, Tax Court Rules of Practice and Procedure, will be necessary in docket No. 6720-84.

Rancho Mirage, California, when they filed their petition in this case. Petitioners Leonard P. and Nancy G. Rome resided in Shaker Heights, Ohio, when they filed their petition in this case. Petitioners Byron S. and Joan L. Krantz resided in Aurora, Ohio, when they filed their petition in this case. Petitioners Charles P. and Gail Malitz resided in Pepper Pike, Ohio, when they filed their petition in this case.

Edward Lewis (Lewis) was a movie producer and president of Edward Lewis Productions, Inc. (ELP). During 1972 and 1973, Lewis conducted negotiations to endeavor to co-produce with the U.S.S.R. a film based on the story "The Bluebird." Lewis envisioned co-producing a picture with the Soviet Union in which the Soviet Union would contribute the production elements and the American company would provide the key stars and director. By agreement dated April 23, 1973, ELP acquired from Louis M. Van Goitsenhoven-Maeterlinck the movie rights in and to the literary work entitled "The Bluebird." Lewis approached Robert H. Greenberg (Greenberg) and Harry N. Blum (Blum) to aid in financing the acquisition of the Maeterlinck rights for $50,000. Blum and Greenberg put up $25,000 for the acquisition of the Maeterlinck rights. An unrelated party put up the remaining $25,000. After Lewis acquired the literary rights to "The Bluebird," he requested Blum and Greenberg's assistance in financing the entire film project.[4]

On December 5, 1973, ELP entered into an agreement with Cinema Studio "Lenfilm" V/O "Sovinfilm" to co-produce "The Bluebird" based on the Maurice Maeterlinck novel of the same name and the photoplay by Alfred Hayes and Alexei Kapler.[5] The production of "The Bluebird" was the first co-production of a film by an American company with film companies of the Soviet Union. On the same date, ELP entered into a contract with "Sovexportfilm" with respect to the distribution of "The Bluebird." Pursuant to the terms of the co-production agreement, ELP was to

---

[4]Blum and Greenberg arranged the financing of the motion picture "Executive Action," a film produced by Lewis. Cinema Ventures was the funding partnership for "Executive Action."

[5]By agreement dated Nov. 29, 1972, ELP engaged the services of Alfred Hayes, as writer, to work on an adaptation for the screenplay of Maurice Maeterlinck's novel "The Bluebird."

provide the playwright, composer, director, the main actors, the producer, and several enumerated items of equipment. The Soviet company was to provide virtually all other elements necessary for the production of the film.[6]

Wenles is an Ohio limited partnership. Blum and ROHA Corp., a corporation owned by Blum and Greenberg, are the general partners of Wenles. Thirty-three investors became limited partners in Wenles.[7]

Prior to the years in issue, Blum was general manager of the Lionel Toy Division of General Mills and was President of Parkway Industries, a hobby and toy contract manufacturer. Subsequent to these positions, Blum headed the venture capital division of W.R. Berkley Co., a financial services company. While employed at W.R. Berkley Co., Blum met Greenberg who was then the senior vice president and executive vice president of Mercantile Industries, an American Stock Exchange Co.

From 1952 through 1965, Greenberg was employed by Heller International, a New York Stock Exchange company. During these years, he served in the positions of director, senior vice president, and general counsel. Prior to meeting Blum, Greenberg was involved in the financing of several motion pictures. Prior to the formation of Wenles, Greenberg formed a partnership known as Cinema Ventures, Ltd. (Cinema Ventures).[8] Additionally, Greenberg and Blum formed Worldwide Productions, Ltd. (Worldwide Productions), an Ohio limited partnership. Blum and Greenberg served as Worldwide's general partners. By offering circular dated January 1974, units were offered in Worldwide Productions. Worldwide Productions' primary investment objective was to invest in feature-length motion pictures and other entertainment ventures. On May 31, 1974, an addendum to Worldwide's offering circular stated that "It

---

[6]On Sept. 24, 1974, Bluebird Productions, Ltd. (BBP),was added to the co-production agreement between ELP and Lenfilm V/O Sovinfilm. However, on Aug. 28, 1974, BBP, contracted with Elizabeth Taylor to perform services as an actress in "The Bluebird."

[7]The general partners of Wenles contributed $500 for their respective general partnership interests. The 33 investors/limited partners purchased 60 partnership units at a cost of $5,000 per unit. The offering circular stated that the minimum participation was the purchase of two units ($10,000).

[8]Management & Equity, Inc., was the general partner of Cinema Ventures, and Greenberg was the managing director of the partnership.

is anticipated that certain proceeds of this offering will be invested in the senior position of a movie, 'The Bluebird.' "

By offering circular dated May 22, 1974, units were offered in the Wenles limited partnership. Rockefeller Industries, a corporation owned by Blum, handled the offering. Blum and ROHA Corp., organized Wenles and served as general partners. The offering circular states that Wenles was formed to acquire and own the rights to a motion picture based on "The Bluebird" by Maurice Maeterlinck. The Wenles offering circular states, in pertinent part:

The units offered by this offering circular are a speculative investment and involve a high degree of risk. In analyzing such an investment, prospective investors should consider carefully, among other factors, the following:

1. *Predicated on Continuation of Detente.* "The Bluebird" is being produced under a co-production agreement with the U.S.S.R. and will be filmed in Leningrad, U.S.S.R. The ability to produce and complete "The Bluebird" is dependent upon the world political situation in general and the continuation of the present detente in particular, * * * . The Partnership will use its best efforts to obtain insurance against political problems which might effect [sic] the production or completion of the picture. Such insurance, if obtainable at all, would merely provide for recoupment of investment. There is no assurance that dramatic changes will not occur on the world scene prohibiting this production or otherwise resulting in a complete loss of the total investment.

2. *Unpredictable Factors in Motion Picture Industry.* These units should not be purchased unless the investor is prepared for the possibility of a total loss. Investment in motion picture production involves a substantial degree of risk. Recoupment of invested capital and the possibility of profit are largely functions of a motion picture's cost of acquisition, development, production and distribution in relation to its ultimate audience appeal, which may depend, among other things, upon unpredictable critical reviews and changeable public tastes, which cannot be ascertained in advance with any reasonable degree of certainty. Industry figures indicate that many motion picture productions do not achieve profitability.

3. *Dependence on Distributor and its Compensation.* Success of a motion picture may be dependent in large part upon the efforts, advertising and publicity expenditures of its distributor or distributors. The distribution of motion pictures is highly competitive; distributors compete with each other for suitable theatrical and non-theatrical outlets, * * * . A distributor of a motion picture may at the same time be engaged in distributing motion pictures owned by such distributor or in which it has varying profit interests and investments, * * * .

Additionally, the Wenles offering circular states:

*Tax Consequences.* The Partnership will acquire the ownership of all rights to exploit the film and its ancillary products (the "property") under existing Federal income tax laws and regulations, the partners, rather than the Partnership itself, will be taxed upon all profits and receive all deductions, generated by the Property.

The Partnership will use the cash method of accounting, reporting income when received and taking deductions when amounts are paid.

It is anticipated that the Partnership's basis of approximately $2,368,000 for depreciation and investment credit will be based upon the contract price of (i) $2,200,000 which it is obligated to pay Bluebird Productions, Ltd. for the making of the film; (ii) upon the Partnership's cash payment of $150,000 for acquisition of the rights and reimbursement for the developmental expenses; and (iii) upon $18,000 for organizational costs of the Partnership.

Depreciation will be taken based upon the "income forecast" method, which the Internal Revenue Service has accepted for use with motion pictures. Under this method, the cost of the film will be amortized based upon the amount of income which it generates in the current year compared to the total anticipated income to be generated over the life of the film. This depreciation will not commence until the film is put into distribution. In order to comply with the investment tax credit requirements imposed by the Revenue Act of 1971 to obtain a maximum credit, no more than 76% of the depreciable basis will be written off in the first three (3) years, nor more than 97% in the first five (5) years.

A tax opinion letter written by Steven L. Kadish (Kadish) and dated May 22, 1974, accompanied the offering circular and stated:

Each Limited Partner's basis for his Partnership interest will be the total of the cost of the following:

(1) the acquisition of cinematographic film and ancillary rights and of the reimbursement for development of the screenplay and music;

(2) the contract with the production service company for production and delivery of a completed film; and

(3) certain organizational costs.[9]

Finally, the offering circular set forth the financing for the production, repayment, and profit participation of "The Bluebird" as follows:

| | |
|---|---|
| Senior loans (1) | $250,000 |
| Junior loan (1) | 500,000 |
| Advance from Wenles Films, Ltd. (1) | 115,000 |
| Bluebird Productions, Ltd | 235,000 |
| Contingent deferments | 350,000 |
| | 1,450,000 |

[9]The opinion letter also stated that the contract price paid to BBP for its production services was a "bonafide fair market amount" incurred and paid in a "bonafide fair market transaction."

(1) To Bluebird Productions, Ltd.

The loans and investments are to be repaid solely from the American co-producer's revenues in the following order of priority, prior to any profit participation.

| | | | |
|---|---|---|---|
| Senior loans | | | $250,000 |
| Wenles Films, Ltd. | 115 | ... parri passu | 230,000 |
| Junior loan | 115 | | |
| Bluebird Productions, Ltd. | 235 | ... parri passu | 470,000 |
| Junior loan | 115 | | |
| Wenles Film, Ltd. | 150 | ... parri passu | 300,000 |
| Junior loan | 150 | | |
| Contingent deferments | | | 350,000 |
| | | | 1,600,000 |

After these recoupments, all additional revenues received by the American co-producer will be distributed to the respective participants in the producer's group. * * * [Fn. ref. omitted.]

In this regard, the offering circular stated that Blum and Greenberg were under contractual agreement to obtain and deliver by June 7, 1974, the following:

(a) $265,000 to acquire ownership of the picture; and

(b) $235,000 to produce the picture; and

(c) $250,000 of senior financing.

The financing transactions for the film "The Bluebird" were set up sometime in late 1974.[10] First, by agreement of sale, ELP sold its literary rights in "The Bluebird" to Wenles. This agreement excluded the sale of the "pay television rights." Wenles agreed to pay ELP $150,000 plus an additional amount set forth in a disbursement of revenues agreement for the rights to "The Bluebird."[11]

Second, Wenles entered into a production agreement with Bluebird Productions, Ltd. (hereinafter BBP), an Illinois partnership. Under the production agreement, Wenles stated that it "has entered into agreements to acquire

---

[10]Petitioners contend that the agreements were signed on Aug. 27, 1974. However, it is not clear to this Court on the record before us that all the agreements in question were indeed signed on that date. In fact, the agreement of sale between ELP and Wenles contain references to certain agreements whose dates remain blank. Moreover, documents dated Aug. 27, 1974, contain sheets with later dates on the bottom of the page. As a result, we cannot find that these agreements were executed on Aug. 27, 1974, although we do find that they were executed sometime in late 1974.

[11]Lewis personally guaranteed the performance of ELP under the purchase agreement.

ownership of a full-length feature motion picture in preparation tentatively entitled "The Bluebird." The parties acknowledged that BBP had already committed funds and secured commitments from distributors and other financing entities for additional loans in financing the performance of BBP's services. The salient features of the production agreement are as follows:

Contractor [BBP] shall perform all non-U.S.S.R. functions necessary to prepare a negative and other materials of the Picture * * * . These functions are to be performed as to fulfill the non-U.S.S.R. obligations of a co-production Agreement of December 5, 1973, with the U.S.S.R. Sovinfilm (the "Co-Production Agreement") to which agreement Contractor became a non-U.S.S.R. party after the foregoing date, and the obligations of Owner [Wenles] under a letter agreement (the "Distribution Agreement") of even date between Owner and Twentieth Century-Fox Film Corp. ("Fox"), which will be replaced by a more definitive agreement at a later date. * * *

Contractor [BBP] covenants that it will engage the services of EDWARD LEWIS as producer, and GEORGE CUKOR as director of the Picture. In connection with substitutes for Cukor or the principal talent, Contractor shall give Fox the rights of consultation and approval set forth in the Distribution Agreement. * * *

* * * , Owner [Wenles] shall pay Contractor [BBP] $115,000 upon execution of this Agreement; and upon acceptance of the Picture * * * , shall pay or cause to be paid to Contractor or its designees as full compensation for Contractor's services hereunder, the further sum of $2,535,000 *solely out of the monies received by Owner from the exploitation of the Picture, as provided in that certain Disbursement of Revenues Agreement dated the date hereof (the "Disbursement of Revenues Agreement") among Owner, Contractor and certain other parties.*
    As a condition precedent to Contractor's obligations hereunder, Contractor shall be provided with (a) an overbudget guaranty of the American costs in form and from a party satisfactory to Contractor; and (b) non-recourse loans to Contractor in amounts aggregating the difference between Contractor's investment of $235,000 and the Budget (excluding from the Budget for the purposes of this computation the contract price paid by Owner * * * plus development expenses paid by Owner to Edward Lewis Productions, Inc. and any and all contingent deferments).
    [Emphasis supplied.]

Pursuant to this production agreement, BBP and ELP entered into a production services agreement whereby ELP would provide the services which would comply with the

production agreement between BBP and Wenles, the co-production agreement with ELP and Sovinfilm, and the distribution agreement with Fox.[12] In consideration for ELP's services, BBP agreed to pay ELP (a) $82,500 during the production of the film; (b) $117,500, payable as a contingent deferment; and (c) such other sums payable to ELP under the disbursement of revenues agreement.

Third, Wenles, BBP, ELP, and Twentieth-Century Fox Films, Ltd. (Fox), entered into an agreement which acknowledged that ELP, as guarantor of the picture, received the sum of $1,600,000 as budget costs of the picture. This guaranty agreement states, in pertinent part:

In consideration of the fee to be paid to the Guarantor [ELP] as set forth in the Budget, * * * the parties hereto hereby agree as follows:
1. On condition that
(a) Parties other than Guarantor have made available to ELP under a Production Services Agreement of even date the sum of $1,350,000, plus $250,000 which will be made available upon delivery of an answer print to Distributor (the "sum") which sum shall be utilized to pay the U.S.-side costs set forth in the Budget referred to above;
(b) Edward Lewis, or if Edward Lewis should be unable or unwilling so to act, his duly appointed successor, is irrevocably empowered to exercise all artistic controls and production controls with respect to the production and completion of the Picture * * * :

the Guarantor hereby agrees, on notice from Owner, BBP or Distributor, to procure or provide all dollar costs of production of the Picture paid or incurred in excess of the Budget * * *
5. Any sums advanced by Guarantor hereunder shall be in the form of non-recourse loans to BBP and shall be repaid to it solely as provided in the Disbursement of Revenues Agreement.
6. This agreement is made by Guarantor for the benefit of *Owner [Wenles], BBP, Cinema Ventures, Ltd., Worldwide Productions, Ltd. and Distributor [Fox]* * * * [Emphasis supplied.]

## Furthermore, the guaranty agreement stated:

8. As security for the repayment to Guarantor of such sums as it may expend pursuant to this instrument, the Owner will execute in favor of the Guarantor and will deliver to the Guarantor all such security

---

[12]Sometime during the period from 1972 through 1974, Lewis of ELP presented "The Bluebird" package (the script and various elements) to Gordon Stohlberg, president of Twentieth Century Fox Film Corp. There was great interest in the project on behalf of Fox. However, as of the time that this agreement was executed, it is clear that no formal distribution agreement existed with Twentieth-Century Fox Films, Ltd. In this regard, the production services agreement states "It is contemplated that the distribution agreement, which is now in letter agreement form, will be replaced by a more formal agreement."

agreements, financing statements and other instruments which in Guarantor's judgment are reasonably necessary to convey to Guarantor a non-recourse lien upon the Picture, the motion picture rights in and to the literary property upon which the Picture is and shall be based, and all music, musical materials and physical properties incorporated therein or acquired for use in connection therewith and the copyright thereof. Said lien and security interest shall be junior and subordinate only to such liens and security interests as are granted to Owner, BBP and lenders (including Distributor) supplying financing for the Picture and the liens and security interests of Distributor to secure distribution rights and fees and expenses. Upon payment to Guarantor of such sums as may be provided by it hereunder, Guarantor will execute and deliver to Owner all releases of lien, quitclaims and other instruments which in Owner's judgment are reasonably necessary to extinguish the lien and security interest of Guarantor herein referred to.

In addition to the lien on Wenles' rights in the picture and literary property, the parties granted ELP an amount equal to 5 percent of 100 percent of the net profits of the motion picture.

Fourth, Wenles and Fox entered into an agreement whereby Fox agreed to be the distributor of the picture. The distribution agreement provided that Fox would lend BBP $800,000 on a nonrecourse basis for use in connection with production expenses.[13] In particular, the agreement stated:

---

[13]The distribution agreement provides, in part:

A. With respect to adjusted gross receipts (as defined below) from all media except those covered in subparagraphs B, C, D, and E below:

(i) 75% of the adjusted gross receipts shall be paid to you [Fox] until you have recouped your distribution fees (25% of the United States and Canadian gross receipts and 30% of the gross receipts from the foreign territories covered by this agreement), and your customary distribution expenses from said 75% and thereafter 50% of the adjusted gross receipts shall be paid to you.

(ii) The balance of the adjusted gross receipts remaining after payment of said 75% or 50% (as the case may be) to you shall be the "producer's share" which shall be applied in the following priority:

(a) The sum of $250,000 shall be paid to the disbursing agent referred to in F Below;

(b) The next remaining balance of the producer's share shall be disbursed as follows: 800/1350ths thereof to you, in repayment of your loans in paragraph 2, and 550/1350ths to the disbursing agent referred to in F below, until the aggregate sum of $1,350,000 (or such lesser amount as shall actually have been provided, and not returned, under paragraph 2) has been paid to you and said disbursing agent collectively.

(c) The next $100,000 of the producer's share shall be paid to you to cover your overhead, supervisory and miscellaneous nondistribution expenses.

(d) Thereafter, there shall be paid any overbudget sums loaned by you, Lewis, us and any third party (plus, in your case, the supervisory fee provided for in paragraph 3 above), pro rata, in the proportion that each party's over-budget loans (including your said supervisory fee) bears to the total over-budget loans (and such supervisory fee); provided, however, that if the over-budget guarantor causes artists or technicians otherwise entitled to receive

It is mutually agreed that all loans to Bluebird Productions, whether by you [Fox] or by others, are on a non-recourse basis, and are repayable only from the receipts to be derived from the distribution and exploitation of the picture and the rights therein * * *

Furthermore, the distribution agreement sets forth the procedures for apportioning the gross receipts of the picture. Additionally, the distribution agreement also provides that:

We [Wenles] will hold title to the picture and be the copyright proprietor thereof. You [Fox] agree that to the extent permitted by law, we, as sole owner of the picture, shall be entitled to the benefits of the investment tax credit and will be entitled to take full advantage of all amortization and other tax deductions flowing from such ownership.

Fifth, Wenles Films, Ltd., Worldwide Productions, Ltd., Cinema Ventures, Ltd., Bluebird Productions, Ltd., Edward Lewis Productions, Inc., Cinevision Productions, Ltd., Marconlee, and Blum entered into a disbursement of revenue agreement by which guidelines were set forth to disburse funds received from Fox by the disbursing agent.

Finally, Wenles Films, Ltd., Worldwide Productions, Ltd., Bluebird Productions, Ltd., and Cinema Ventures, Ltd., entered into an allocation agreement with respect to revenues received from distribution of "The Bluebird."

In the years prior to "The Bluebird's" official release in May 1976, several alleged financing transactions transpired. First, on October 3, 1974, BBP executed a 10-year, 8-percent nonrecourse collateral note to Fox for the principal sum of $800,000. This note states that:

Payment of principal and interest on this Note is without recourse to Maker and such payment is to be made only out of those gross receipts which have been assigned to the Lender pursuant to said Guaranty and Security Agreement and those contract payments assigned to the Lender pursuant to said Loan and Security Agreement. Lender, by its acceptance hereof, agrees that neither maker, Wenles Films, Ltd., nor any individual

over-budget cash payments from him on account of compensation overages to defer such payments and to look to the proceeds of the picture therefor, and if such payments are to be made pro rata with the recoupment of other over-budget payments and loans, then such deferments will also be payable pro rata pursuant to this subparagraph (d);

(e) The balance of the producer's share then remaining shall be paid to us (subject to your right to receive a portion of our share for your over-budget advances, as provided in paragraph 3).

(iii) The determination of producer's share shall be subject to the continuing recoupment of your distribution fees and expenses and therefore shall be periodically recalculated.

venturer or partner of maker or of Wenles Films, Ltd. or of their successors or assigns shall be personally liable for payment of principal or interest on this Note. * * *

In return for agreeing to provide advances totaling $800,000, Fox was to receive 50 percent of "The Bluebird" profits in addition to its distribution fees and customary distribution expenses.

Second, BBP executed a 10-year, 8-percent nonrecourse collateral note to Worldwide Productions, Ltd., for the principal sum of $150,000. In return, Worldwide Productions, Ltd., was to receive a certain percentage of net profits from "The Bluebird." Additionally, BBP executed a 10-year, 8-percent nonrecourse note to Cinema Ventures for the principal sum of $100,000. Cinema Ventures was to receive a certain percentage of the net profits in "The Bluebird." Both of these notes are undated and contain the same limiting language of the Fox note quoted above.

During the filming of "The Bluebird" on location in the Soviet Union, production problems occurred. In May 1975, production of "The Bluebird" ceased in the U.S.S.R. In an attempt to save the project, William Immerman, a Fox executive, traveled to the Soviet Union to renegotiate the co-production with the Soviet production companies. By May 1975, Fox orally agreed to replace ELP as over-budget guarantor.[14] When Fox took the responsibility for the film's production, the filming was over-budget and more funds were needed to complete the film. On June 1, 1975, BBP executed a 10-year, 8-percent nonrecourse collateral note to Fox for the principal sum of $705,000.[15] Again, this note contained the language of the previous BBP notes limiting the parties' liability. When Fox replaced ELP as over-budget guarantor, Fox required BBP to agree to advance $227,500, as needed, towards production costs. In total, Fox's production payments for "The Bluebird" were $2,576,426.94.[16]

---

[14]Additionally, Paul Maslansky replaced Lewis as producer of "The Bluebird." Lewis became executive producer.

[15]As a result of Fox's agreement to advance $705,000, an agreement was executed on May 1, 1975, which modified the distribution agreement to cover the advances in question.

[16]At the time Fox replaced ELP as over-budget guarantor, Fox executives placed their anticipated budget costs of "The Bluebird" at $2,472,000. Fox stated that with certain reductions and "the exclusion of the tax group's investment of $750,000," Fox's total commitment would be $1,627,000.

On May 4, 1976, "The Bluebird" had its world premiere at the Kennedy Center, Washington, D.C. The reviews of the film were mixed.[17] On May 5, 1976, Variety described the production:

> Edward Lewis initiated the project and winds up as exec producer after Paul Maslansky took over line producing chores, with Lee Savin and Paul Radin as coproducers. Final cost is unknown, as *20th's production investment risk is limited to about the cost of two average features,* and the Russian state film industry does not publish p&l statements. But the lavish physical potentials were somewhat offset in the complicated production and postproduction scramble, most visible evidence being less-than-contemporary standards of achievement in the many optical and special visual effects.

* * * * * * *

> *This latest [production of "The Bluebird"] reflects the complexities of modern financing — a tax-shelter project ("Services by Bluebird Prods. Ltd."),* made "in cooperation with Tower International," also *"produced in association with Robert H. Greenberg and Harry N. Blum,"* with *Wenles Films Ltd., the copyright holder.* Shooting was done in Russia, and postproduction mainly in London.
>
> [Emphasis supplied.]

Fox collected the film rentals from the theaters and prepared a report to be forwarded to every revenue participant. The total gross revenues received by Fox from the distribution of the film in Wenles' exclusive and joint territories through November 3, 1979, was $1,743,972.[18] These reports were referred to as "statement of participation." The distribution agreement named Continental Illinois National Bank & Trust as disbursing agent. However, on January 20, 1978, by amendment to the disbursement of revenues agreement executed by Wenles and Worldwide, Steven L. Kadish (Kadish) replaced Continental Illinois

---

[17]While some reviews were more favorable, reviews of the film overall were not good. Vincent Canby, film critic for the New York Times, wrote that " 'The Bluebird' isn't a movie. It's a covenant with boredom." (May 16, 1976)

[18]Fox distributed the film nationwide as well as in Venezuela, Panama, Philippines, Thailand, Belgium, Greece, Holland, Switzerland, South Africa, France, Italy, Germany, and Australia. The following represents the accumulated gross receipts of "The Bluebird":

| Date | Accumulated total gross receipts |
|---|---|
| $479,811 | Through 10/30/76 |
| 1,297,270 | Through 10/29/77 |
| 1,607,920 | Through 11/04/78 |
| 1,743,972 | Through 11/03/79 |

Bank & Trust as disbursing agent.[19] Due to this amendment, Continental Illinois National Bank & Trust did not execute its duties as disbursing agent.

During the years in issue, Fox paid the following amounts to Kadish as disbursing agent with respect to the revenues from "The Bluebird":

| Date of check | Amount |
| --- | --- |
| Mar. 3, 1978 | $162,341 |
| July 19, 1978 | 18,842 |
| Nov. 6, 1978 | 16,382 |
| Feb. 5, 1979 | 12,374 |
| May 7, 1979 | 11,719 |
| Aug. 1, 1979 | 8,730 |

During taxable years 1978 and 1979, Kadish, as disbursing agent, made payments of $71,565.60 and $28,434.40, respectively, to Cinema Ventures. During taxable years 1978 and 1979, Kadish, as disbursing agent, made payments to Worldwide in the respective amounts of $107,348.40 and $42,651.60. During 1979, Kadish, as disbursing agent, made a payment of $24,056.61 to BBP. Kadish, as disbursing agent, paid $27,127.67 to Wenles between 1978 and November 1979.

In 1979, Wenles received $102,000 from Fox as an advance against the television distribution receipts from "The Bluebird." In consideration for this advance, Fox would retain the first $175,000 of the television distribution receipts.[20]

During the years in issue, Wenles reported its income on the cash-basis method of accounting. On its Form 1065 for the taxable year 1976, Wenles reported no income from the film "The Bluebird." On Schedule J, Wenles depreciated the film under the income forecast method. Wenles stated the depreciable basis of the film was $3,459,683 and deducted $1,383,873 for taxable year 1976. For its taxable year 1977, Wenles claimed no income from the film and deducted $1,383,873 in depreciation. For its taxable year 1978, Wenles reported no income for the film and deducted

---

[19]Kadish is the petitioner in docket No. 33395-83. Kadish also serves as the attorney-of-record for petitioners.

[20]In regard to this transaction, Wenles was referred to as the "tax shelter group" involved with "The Bluebird." Roger Sherman, Lewis' attorney, referred to Wenles and BBP as "private financiers."

depreciation of $518,952. For taxable year 1979, Wenles reported gross receipts and gross profit with respect to "The Bluebird" of $122,392 and deducted depreciation of $172,985.

Charles Malitz[21] (Malitz), a certified public accountant, prepared Wenles' Forms 1065 for taxable years 1976 through 1979. Malitz prepared Wenles' Forms 1065 for the years at issue based upon information provided to him by Blum.

In his notices of deficiency, respondent denied petitioners' distributive share of loss with respect to petitioners' interests in Wenles.[22] Respondent alleges that petitioners have failed to establish that Wenles incurred a loss. Furthermore, respondent contends that petitioners' share of Wenles' depreciation deduction is not allowable for three reasons. First, respondent asserts that Wenles' depreciation deduction is not allowable under the income forecast method for some of the taxable years in question, due to the fact that Wenles reported no income for those taxable years. Second, respondent alleges that petitioners have not established the adjusted basis of the assets allegedly subject to depreciation. Finally, respondent contends that the nonrecourse financing cannot be considered in the determination of the

---

[21]Malitz is a petitioner in docket No. 20644-84.

[22]Petitioners' interests are as follows:

| Petitioners | Profit/loss ratio | Petitioners | Profit/loss ratio |
|---|---|---|---|
| John S. Allerton and Juanita L. Allerton | 3.17 | Leonard C. Rosenberg and Sally P. Rosenberg | 1.58 |
| Stephen L. Kadish | 0.79 | Sol J. Roth and Harriet Roth | 3.17 |
| Byron S. Krantz and Joan L. Krantz | 3.96(1976, 1977) 3.17(1978, 1979) | Donald P. Schneider and Elaine M. Schneider | 3.17 |
| Charles Malitz | 2.11 | Betty J. Schur | 3.17 |
| David Margolis and Thelma Margolis | 3.17 | Richard B. Steuer and Jean K. Steuer | 1.58 |
| Beno Michel and Elaine Michel | 1.58 | Ellen M. Unger and Constance Unger | 3.16 |
| Richard W. Pogue and Patricia R. Pogue | 3.17 | Lawrence R. Weiss and Joan Weiss | 3.17 |
| Richard D. Reinberg and Ruth Reinberg | 0.79 | S. Sidney Zilber and Elizabeth L. Zilber | 1.58 |
| Leonard P. Rome and Nancy G. Rome | 1.58 | | |

adjusted basis of Wenles' assets because (1) it is not established that these were bona fide loans of Wenles; and (2) the loans were contingent and lacked economic substance.

## OPINION

The initial focus of our inquiry is to determine the ownership interest acquired by petitioners as limited partners of Wenles. Petitioners assert that, as the owner of the copyright and related rights in the literary property and the film of "The Bluebird," Wenles was the sole and exclusive owner of the film, both in form and in substance. Respondent contends that Wenles was engaged in a joint venture with respect to the movie "The Bluebird." In the alternative, respondent posits that Wenles' adjusted basis in "The Bluebird" is limited to Wenles' cash investment of $265,000.

Whether Wenles became owner of the film for tax purposes as a result of its transactions with ELP, BBP, Fox, and the other parties involved in the production of "The Bluebird" is a question of fact to be determined by reference to the written agreements and the attendant facts and circumstances before us. *Durkin v. Commissioner,* 87 T.C. 1329, 1367 (1986); *Tolwinsky v. Commissioner,* 86 T.C. 1009, 1040 (1986); *Law v. Commissioner,* 86 T.C. 1065, 1095 (1986); *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1237 (1981); *Miller v. Commissioner,* 68 T.C. 767, 776 (1977).

Petitioner asserts that the transfer of the film rights was achieved by a sale of the rights by ELP. The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. *Commissioner v. Brown,* 380 U.S. 563 (1965). The transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred is disregarded for tax purposes. *Tolwinsky v. Commissioner,* 86 T.C. at 1041; *Law v. Commissioner,* 86 T.C. at 1094. See also *Helvering v. Clifford,* 309 U.S. 331 (1940); *Helvering v. Lazarus & Co.,* 308 U.S. 252 (1939); *Hilton v. Commissioner,* 74 T.C. 305

(1980), affd. 671 F.2d 316 (9th Cir. 1982); *Miller v. Commissioner*, 68 T.C. 767 (1977). "Taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss v. Bowers*, 281 U.S. 376, 378 (1930). The entitlement to deduct depreciation is not predicated on the mere holding of legal title but rather upon capital investment. *Gladding Dry Goods Co. v. Commissioner*, 2 B.T.A. 336 (1925).

The sale of a motion picture for Federal tax purposes occurs when there is a transfer of all substantial rights of value in the motion picture copyright.[23] No sale occurs if the transferor retains proprietary rights in the motion picture. *Durkin v. Commissioner, supra; Tolwinsky v. Commissioner*, 86 T.C. at 1042-1043. See *Carnegie Productions, Inc. v. Commissioner*, 59 T.C. 642, 653 (1973); *Cory v. Commissioner*, 23 T.C. 775 (1955), affd. 230 F.2d 941 (2d Cir. 1956). The consideration, for tax purposes, as to whether the benefits and burdens of ownership have been transferred is essentially a factual determination. *Leahy v. Commissioner*, 87 T.C. 56, 66 (1986). The pertinent factors for consideration were outlined in *Houchins v. Commissioner*, 79 T.C. 570, 591 (1982), to be:

ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances. *Grodt & McKay Realty, Inc. v., Commissioner, supra.* Among the factors to be considered in making this determination are: (1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether

---

[23]The transfer of title to a motion picture is accomplished through the transfer of both the negative and the copyright. Ownership of a motion picture negative is distinct from ownership of the copyright thereto (17 U.S.C. sec. 27 (1976); 17 U.S.C. sec. 202 (1982) (effective Jan. 1, 1978); *Michael Todd Co. v. County of Los Angeles*, 57 Cal. 2d 684, 371 P.2d 340, 21 Cal. Rptr. 604 (1962), and cases cited therein), and ownership of the former without possession of at least certain of the rights encompassed by the latter is commercially valueless. See *Misbourne Pictures Ltd. v. Johnson*, 189 F.2d 774, 776 (2d Cir. 1951). Copyrights are monopolies; "they entitle the owner to prohibit various kinds of reproduction, and to relieve individuals of these prohibitions by licenses." *Goldsmith v. Commissioner*, 143 F.2d 466, 467 (2d Cir. 1944) (L. Hand, J., concurring), affg. on other grounds 1 T.C. 711 (1943). With respect to a motion picture, the exclusive rights that comprise the so-called "bundle of rights" that is a copyright are the rights to produce copies of the motion picture, prepare derivative works based upon the motion picture, distribute copies of the motion picture to the public by sale or rental, exhibit the motion picture to the public, and display still photographs taken from the motion picture to the public. 17 U.S.C. sec. 1 (1976); 17 U.S.C. sec. 106 (1982) (effective Jan. 1, 1978). Such rights may be subdivided indefinitely and may be owned and enforced separately. 17 U.S.C. sec. 201(d) (1982) (effective Jan. 1, 1978).

the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation or disposition of the property. See *Grodt & McKay Realty, Inc. v. Commissioner, supra* at 1237-1238. * * * [Fn. ref. omitted.]

It is well established that the economic substance of a transaction, rather than its form, controls for Federal tax purposes. *Gregory v. Helvering,* 293 U.S. 465 (1935); *Derr v. Commissioner,* 77 T.C. 708 (1981). We must be concerned with the economic realities and not necessarily the form employed by the parties. *Frank Lyon Co. v. United States,* 435 U.S. 561 (1978); *Estate of Franklin v. Commissioner,* 64 T.C. 752 (1975), affd. on other grounds 544 F.2d 1045 (9th Cir. 1976).

We consider it equally important that we should not disregard the existence of an asset for which Congress intended tax advantages merely because the parties attempted to maximize the advantage of those benefits for one of the parties to a transaction. In instances where there are no shams and depreciable assets exist, some person or entity is entitled to the intended tax advantages. See *Estate of Thomas v. Commissioner,* 84 T.C. 412, 433-440 (1985). If Wenles owned 100 percent of the film rights to "The Bluebird," Wenles, and thus petitioners, would be entitled to the total depreciation allowable with regard to the film rights. However, on the record before us, we find that petitioners have overreached in arguing that they are entitled to the total depreciation allowable with respect to "The Bluebird."

Section 761(a)[24] defines a "partnership" broadly to include "a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate." The meaning of the term for Federal tax purposes is broader in scope than the meaning of the term at common law. Sec. 1.761-1(a), Income Tax Regs; *Bussing v. Commissioner,* 88 T.C. 449, 460 (1987), supplemental opinion 89 T.C. 1050 (1987); *McManus*

---

[24]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

*v. Commissioner,* 583 F.2d 443 (9th Cir. 1978), cert. denied 440 U.S. 959 (1979). A partnership for Federal income tax purposes is formed when the parties to a venture join together capital or services with the intent of conducting a business or enterprise and sharing the profits and/or losses of the venture. *Bussing v. Commissioner, supra; Commissioner v. Tower,* 327 U.S. 280 (1946); *Commissioner v. Culbertson,* 337 U.S. 733 (1949); see also *Smith's Estate v. Commissioner,* 313 F.2d 724 (8th Cir. 1963); 1 W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 3.02 (1977). After a thorough consideration of the facts and circumstances of this case, we find that Wenles, Cinema Venture, Worldwide, BBP, and Fox became joint venturers in the film "The Bluebird." As such, Wenles does not own 100 percent of the photoplay, but jointly owns that right with the other members of the joint venture.

On paper, petitioners endeavored to set up the following scenario. Wenles was formed by Blum and ROHA Corp. (owned by Blum and Greenberg) to own the rights to the movie "The Bluebird." Worldwide Productions, formed by Blum and Greenberg, and Cinema Ventures, formed by Greenberg, lent funds to the production. BBP was formed by Greenberg to serve as the production company. In addition to its lending status, Fox was the distributor for the movie. Petitioners assert that Wenles was the "fulcrum" for the independent financing arranged for "The Bluebird," negotiated at arm's length for the remaining funds to be advanced from various lenders and BBP, and retained and exercised "significant" controls over the project from initial financing through distribution. As such, petitioners seek to portray Wenles as the vital force in the production of "The Bluebird" to convince this Court that Wenles was the sole owner of the film rights and thus was the only entity entitled to depreciation.

In substance and reality, BBP, Fox, Worldwide, Cinema Ventures, and Wenles invested capital in a joint venture to produce the movie "The Bluebird." Wenles' cash contribution to "The Bluebird" consisted of a payment in the amount of $150,000 to ELP for acquisition of the film rights to "The Bluebird" and a payment in the amount of

$115,000 to BBP under the production agreement. BBP initially advanced $235,000 to the production and later agreed to advance $227,500. Worldwide contributed $150,000. Cinema Ventures contributed $100,000. Fox's total cash contribution was $2,576,426.94. All these cash contributions, whether or not covered by what petitioner refers to as the nonrecourse notes of BBP, were to be repaid solely from the receipts from the distribution of "The Bluebird." Thus, in total, the parties to the joint venture contributed $3,553,926.94. Wenles' share of the contributions was approximately 7 percent.

Several aspects of the deal compel the finding that the parties combined their efforts into a single business enterprise. The agreements executed by Wenles, BBP, Worldwide, Cinema Ventures, and Fox illustrate that the parties joined together capital with the intent of sharing the profits and losses of the production and distribution of "The Bluebird."

ELP purchased rights to "The Bluebird" for $50,000 and "sold" these rights to Wenles for $150,000 plus an additional amount set forth in the disbursement of revenues agreement. Next, although on December 5, 1973, ELP had entered in a co-production agreement with "Lenfilm" V/O "Sovinfilm" to co-produce "The Bluebird," Wenles entered into a production agreement with BBP in 1974. Wenles agreed to pay BBP $115,000 upon execution of the agreement and $2,535,000 solely out of the revenues from distribution of the picture. BBP, in turn, agreed to pay ELP certain sums. Then, Wenles and Fox entered into an agreement whereby Fox would lend BBP $800,000 on a nonrecourse basis for production of expenses, and Worldwide and Cinema Venture allegedly executed nonrecourse notes to BBP for production funds of $150,000 and $100,000, respectively. Finally, Wenles, BBP, ELP, and Fox entered into a guaranty agreement with ELP which acknowledges that ELP received the sum of $1,600,000 as the budget cost of the purchase.[25]

It is no coincidence that the production funds of $1,600,000 received by ELP equal the funds "lent" by Fox,

---

[25]The guaranty agreement states that it was made for the benefit of Wenles, BBP, Cinema Venture, Worldwide Production, and Fox. Thus, we view ELP's role as an independent contractor with the members of the joint venture.

BBP, Wenles' Cinema Ventures, and Worldwide.[26] In reality, Fox invested half of the production funds of $800,000, and Greenberg and Blum raised the other half of the projected production funds of $800,000 by creating four separate entities: Worldwide, Cinema Ventures, Wenles, and BBP. When production problems plagued "The Bluebird" set in 1975, Fox invested an additional $705,000, and BBP advanced $227,500. In total, Fox contributed $2,576,426.94 to the production of "The Bluebird"; Wenles contributed $265,000; Worldwide contributed $150,000; Cinema Ventures contributed $100,000; and BBP contributed about $462,500.

Not only did the parties to the joint venture join together to infuse capital into the production of "The Bluebird," the distribution of revenues agreement and the allocation agreement serve to confirm that Wenles, BBP, Fox, Cinema Ventures, and Worldwide shared in the profits of the Venture. Additionally, Wenles, BBP, Cinema Ventures, and Worldwide, through Greenberg and Blum, had the right, although apparently unexercised, to exercise some decision making in the production and distribution process. The sharing of profits, the contribution of capital and its risk of loss, and the sharing of control are all hallmarks of a joint venture.

The events leading up to the formation of the Wenles partnership do not support petitioners' contention that Wenles was the fulcrum for the independent financing arranged for "The Bluebird." Rather, after acquiring the rights to "The Bluebird," Lewis requested Blum and Greenberg's assistance in financing the entire film project. Apart from Fox's majority funding for the production, Blum and Greenberg, as individuals and not as general partners of Wenles, orchestrated the financial package for "The Bluebird." Correlatively, Cinema Ventures, Worldwide, and Wenles were all organized by Greenberg and Blum.

From the evidence presented on the record, the actual role of BBP is clouded with uncertainty. At trial, Blum whose testimony was self-serving and not credible, testified that BBP had "total control" of the production of "The Blue-

[26]The Wenles offering circular states that BBP was to invest $235,000 in the project. The production agreement confirms this fact.

bird." This statement is clearly incorrect. While BBP nominally executed contracts, kept some records, and maintained an individual on the production set, the evidence clearly establishes that ELP, and then Fox, had substantial control over the actual filming of "The Bluebird." Fox also controlled distribution of "The Bluebird." On the record as a whole, BBP only served to infuse production capital into the project and was created to "muddy the waters" of the true financial dealings of Greenberg and Blum.

In this regard, the nonrecourse notes allegedly executed by BBP on behalf of Fox, Cinema Ventures, and Worldwide are not bona fide indebtedness. Petitioner makes much of the fact that the "repayment" of Cinema Ventures and Worldwide from the revenues of "The Bluebird" illustrates the bona fides of these notes. We cannot agree. No interest was paid on these notes. The copies of the Cinema Venture and Worldwide notes are undated, unsigned, and clearly nonrecourse. Upon a close examination of the record before us, we find that the nonrecourse obligations were simply a mechanism for allocating receipts from the film to Fox, Cinema Ventures, and Worldwide, while attempting to give the Wenles partnership a greater depreciable basis. Accordingly, we find that the nonrecourse obligations used by the partnership lacked "purpose, substance, or utility apart from their anticipated tax consequences." *Goldstein v. Commissioner,* 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965).

Considering the foregoing, our examination of the written agreements and the circumstances surrounding Wenles' acquisition of the copyright, and the negative of "The Bluebird," lead us to determine that the movie was a viable property and that Wenles had acquired an ownership interest that would entitle its limited partners to claim depreciation. We do not find, however, that the ownership interest was acquired, as alleged, by means of a purchase and sale of the copyright and other literary rights. This transaction was not a transfer of property for money or a promise of payment. *Commissioner v. Brown,* 380 U.S. 563 (1965). Instead, the transaction is one where Wenles was permitted to join Fox, Cinema Ventures, BBP, and Worldwide to jointly own, exploit, and participate in the profits

from the film. As such, we find that the substance of the transaction for Federal income tax purposes is that Wenles acquired an interest in a joint venture with Fox, BBP, Cinema Ventures, and Worldwide. *Bussing v. Commissioner,* 88 T.C. at 460; *Leahy v. Commissioner,* 87 T.C. 56, 71 (1986). See *Podell v. Commissioner,* 55 T.C. 429, 431 (1970), and cases cited therein. The facts of this case are distinguishable from those set forth in *Tolwinsky v. Commissioner, supra,* and *Law v. Commissioner, supra.*

We must now determine if petitioners are entitled to depreciation of the film "The Bluebird." Respondent disallowed all depreciation claimed by petitioners through their interest in Wenles. Petitioners bear the burden of proving their depreciable basis and their entitlement to deductions, including depreciation. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142. We have determined that petitioners did not purchase an exclusive interest in the movie. Petitioners' allowable depreciation is defined by Wenles' percentage share of the depreciation determined with respect to the joint venture. Herein lies the problem.

Even if we could accurately determine petitioners' percentage share of depreciation and could definitely determine that the joint venture's production cost and thus depreciable basis was $3,459,683,[27] the record in this case prevents us from determining petitioners' allowable depreciation for the following reasons.

On its Form 1065 for the taxable years at issue, Wenles, and thus petitioners, depreciated the film under the income forecast method. Petitioners acknowledge that the term "income forecast" was utilized on Wenles' Form 1065; however, petitioners contend that the use of this term on Form 1065 should not estop petitioners from using some other depreciation method. We must agree with respondent that petitioners are limited to determining depreciation under the income forecast method.

Section 167(a) allows as a deduction for depreciation a reasonable allowance for the exhaustion, and wear and tear of property used in a trade or business or held for the

---

[27]The depreciation available to the joint venture is dependent on the basis of an asset. Sec. 167(g). Secs. 1011 and 1012, read in conjunction with sec. 167(g) provide that depreciable basis shall be the properties' cost.

production of income. Under section 1.167(b)-O(c), Income Tax Regs., any method of depreciation that results in a reasonable allowance may be selected for each item, but such method "must thereafter be applied consistently to that particular item." With certain exceptions not relevant to the present case, section 1.167(e)-1, Income Tax Regs., specifically provides in pertinent part that:

Any change in the method of computing the depreciation allowances with respect to a particular account * * * is a change in method of accounting, and such a change will be permitted only with the consent of the Commissioner, * * * . * * * Any request for a change in method of depreciation shall be made in accordance with section 446 and the regulations thereunder * * *

Accordingly, once a taxpayer elects an acceptable method of depreciation, he may in general change that method only with the consent of respondent. Sec. 1.167(e)-1(a), Income Tax Regs.; sec. 1.446-1(e)(2), Income Tax Regs.; *Foley v. Commissioner,* 56 T.C. 765, 770 (1971); *Mitchell v. Commissioner,* 42 T.C. 953, 968 (1964).

Section 1.446-1(e)(3), Income Tax Regs., provides that in order to secure respondent's consent for a change in method of accounting, Form 3115 must be filed with respondent within 180 days after the beginning of the taxable year in which it is desired to change methods. Respondent has set forth taxpayer compliance requirements in Rev. Proc. 74-11, 1974-1 C.B. 421. Respondent's refusal to consent to a change of method is ordinarily within his administrative discretion (*Brown v. Helvering,* 291 U.S. 193, 204 (1934)), and is not to be disturbed unless respondent's refusal to consent was arbitrarily withheld. *Casey v. Commissioner,* 38 T.C. 357, 386-387 (1962).

Petitioners elected to use the income forecast method. Petitioners did not secure respondent's consent to change this method. Therefore, petitioners were required to use that method as prescribed by respondent. See *Greene v. Commissioner,* 81 T.C. 132 (1983).

The income forecast method requires the application of a fraction, the numerator of which is income from the depreciable asset for the taxable period, and the denominator of which is the estimated total income from the asset during its useful life. The cost of the depreciable asset is

multiplied by such fraction to calculate the depreciation allowed for the taxable period. For such method, the term "income" means the taxpayer's net, rather than gross, income. See *Durkin v. Commissioner*, 87 T.C. 1329, 1374 (1986), and cases cited therein.[28]

Under the income forecast method, if the depreciable property does not generate net income during a taxable year, no depreciation deduction is allowable for the year. *Fife v. Commissioner*, 82 T.C. 1, 8-9 (1984); *Greene v. Commissioner, supra*; *Wildman v. Commissioner*, 78 T.C. 943, 951 (1982); *Siegel v. Commissioner*, 78 T.C. 659, 693 (1982).

If the income forecast method is applied for the taxable years in issue, the evidence on the record lacks essential facts necessary to establish a critical element of that method: the determination of the denominator of the fraction or the estimated total income to be derived from the film during its useful life. Respondent's deficiency notices dispute petitioners' utilization of the income forecast method. Thus, the burden of proof with respect to these depreciation deductions is on petitioners. *Welch v. Helvering, supra*; Rule 142(a).

On its Form 1065, Wenles stated that the depreciable basis of the film was $3,459,683. However, it is unclear from the record if Wenles ever took estimated income into account in its calculation of depreciation. Petitioners did not present any expert witnesses at trial and did not lodge any expert reports with the Court to establish the value of the movie so as to arrive at total income for depreciation purposes.[29]

Moreover, it is clear from the record that Wenles, when it computed its depreciation deduction, did not produce a record of the basis for these deductions. Petitioners presented no work papers of how they arrived at their

---

[28]With respect to a film, respondent has concluded that the general methods of depreciation prescribed in sec. 167(a) are inadequate because a firm will typically produce an uneven flow of income, and a film's usefulness is realistically measured by the income it produces and cannot adequately be measured by the passage of time alone. Rev. Rul. 60-358, 1960-2 C.B. 68; Rev. Rul. 64-273, 1964-2 C.B. 62. Therefore, respondent devised the "income forecast" method of depreciation.

[29]William Immerman, a Fox executive, was a credible witness. However, we cannot glean enough information from his testimony to estimate the total income to be derived from "The Bluebird" during its useful life.

numbers. In fact, Blum testified that the projections of gross income varied from year to year and were not committed to writing. In sum, Blum could not recall the origin of the figures utilized by Malitz to determine the depreciation claimed by Wenles on Form 1065. However, as we have determined that Wenles was engaged in a joint venture with respect to the production and distribution of "The Bluebird," the depreciation deduction must be computed using the basis, income, and expected income of the joint venture. The record in this case does not contain sufficient information and the computations necessary to compute the depreciation allowable to the joint venture.[30] Due to the lack of evidence presented by petitioners on this issue, we find that petitioners have not met their burden of proof with respect to the depreciation deductions during the taxable years at issue. As such, we must sustain respondent's determinations.

To reflect the foregoing,

> *Decision will be entered for the respondent in docket Nos. 29326-83, 29997-83, 31535-83, 32938-83, 32940-83, 33395-83, 33396-83, 33398-83, 33425-83, 33426-83, 34738-83, 4284-84, 4285-84, 4286-84, 4403-84, 4446-84, 4447-84, and 20644-84.*
>
> *Decision will be entered under Rule 155 in docket No. 6720-84.*

---

[30]The most detailed numbers in the record are Fox's statements of participation. However, the statements of participation, standing alone, are not sufficient to compute depreciation under the income forecast method for the joint venture. Petitioners assert that they constructively received income from Fox in 1977 and thus are entitled to a depreciation deduction in taxable year 1977. It appears that petitioners did receive income from "The Bluebird" in taxable years 1978 and 1979. However, we do not reach the constructive receipt issue as we cannot determine the underlying computations necessary to the income forecast method of depreciation in any taxable year before the Court.