CARLAND, INC., Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

No. 89–2148.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 15, 1990.

Decided July 12, 1990.

Rehearing Denied Aug. 21, 1990.

**1102**

J. Glenn Hahn, Kansas City, Mo., for appellant.

Robert W. Metzler, Washington, D.C., for appellee.

Before LAY, Chief Judge, BEAM, Circuit Judge, and WOODS,* District Judge.

LAY, Chief Judge.

Carland, Inc. (Carland) appeals the Tax Court's decision upholding income tax deficiencies assessed by the Commissioner of Internal Revenue (Commissioner) for the years 1970–1975. The Tax Court sustained deficiencies in the following amounts: 1970—$586,844; 1971—$480,858; 1972—$212,449; 1973—$37,128; 1974—$36,420; 1975—$11,227. We affirm in part and reverse in part.

## I. BACKGROUND

Since 1964 Carland has been in the business of leasing various types of tangible personal property, including railroad rolling stock, automotive equipment, railway roadway maintenance equipment, aviation equipment, communication equipment, and other miscellaneous equipment. During the time period relevant to this case, Veals, Inc., a member of the Kansas City Southern Industries, Inc. (Industries) consolidated corporate group, owned 75 percent of Carland's stock. The principal lessees of Carland's equipment during the years 1964 through 1975 were Kansas City Southern Railway Company (Kansas City Southern Railway) and Louisiana & Arkansas Railway Company (L & A Railway), both members of the Industries consolidated group. Other lessees during that period included other members of the Industries consolidated group as well as entities unrelated to Industries.

Substantially all of the leases entered into by Carland from 1964 through 1975 contained either a 5–year primary term with three 1–year renewal options or a 3–year primary term with five 1–year renewal options. The leases provided for rent to be paid to Carland over the *primary* term in amounts sufficient to cover the acquisition cost of the leased asset plus an annual 3 percent after-tax rate of return. By contrast, the rental rates for the *renewal* periods were nominal—typically 1 percent of the cost of the equipment.[1] Even though the primary and renewal periods of Carland's leases totalled 8 years, the actual length of equipment rentals extended beyond this 8–year period on several occasions.[2] In such cases the lessee would continue to pay the renewal rate.

---

* The HONORABLE HENRY WOODS, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. Lease No. 500, dated February 18, 1972, is an example of a typical Carland equipment lease. A broad array of equipment items ranging from boxcars to office furniture is set forth in an appendix to the lease. *See* Jt.App. at 377–81. The annual rent to be paid by the lessee, in this case Kansas City Southern Railway, is determined using "rental factors" stated as a percentage of acquisition cost. Schedule A of the lease sets the rental factor for a 5–year primary term at 24.3% and the rental factor for a 3–year primary term at 37.0%. The rental factor for the renewal periods is set at 1% in both cases. Thus, the rent payable on a $10,000 asset over a 5–year primary period would be $12,150 (approximately 98% of total 8–year income); the

rent payable over the remaining three years of renewal would be $300 (approximately 2% of total 8–year income). If the asset were leased for a 3–year primary period, the rent payable over the first three years would be $11,100 (approximately 96% of the total 8–year income); the rent payable over five years of renewal would be $500 (approximately 4% of the total 8–year income).

2. This was the explicit finding in an earlier decision analyzing leases entered into by Carland and members of the Industries consolidated group in the years 1964 through 1969. *See Kansas City Southern Ry. v. Commissioner*, 76 T.C. 1067, 1088 (1981). The Tax Court in *Kansas City Southern* noted that continued rental after the lease period was not uncommon in the leasing industry during that period. *Id.* at 1089

Carland used an "income forecast" method to calculate depreciation on all its leased equipment. Under this method Carland calculated the annual depreciation allowance for each asset by multiplying the acquisition cost of the asset by a fraction which had as its numerator the rental income accrued for that year and as its denominator the total rental income expected to be received over the primary and renewal periods of the lease covering that asset. Carland took no salvage value into account in calculating depreciation because it estimated that salvage value was in all instances less than 10 percent of the asset's cost. *See* I.R.C. § 167(f) (1990) (taxpayer may reduce salvage by up to 10% of basis). Using this depreciation formula in tandem with the rental payment structure prescribed by its leases, Carland was able to recover approximately 96 percent to 98 percent of an asset's cost over the *primary* term of the lease.[3] The Tax Court found that Carland's use of the income forecast method in this way resulted in unreasonably high depreciation allowances, thus violating section 167 of the Internal Revenue Code.

In reaching its conclusion the Tax Court found that the usefulness of Carland's assets was adequately measured by a time-based formula. The court stated that it perceived no reason for turning to the income forecast method which "keys the useful life of the asset to the income produced." *Carland v. Commissioner*, 90 T.C. 505, 545 (1988). The court observed that Carland's use of the income forecast method arbitrarily equated the useful life of the asset with the primary lease term, noting that "there is nothing in the record to support the notion that the primary lease terms for the leased assets and their economic useful lives in petitioner's business operations were one and the same." *Id.* at

546. The court also found fault in Carland's depreciation method because it did not properly account for salvage values. *Id.* The court concluded that Carland would be required to recompute its depreciation under the double declining balance depreciation method[4] using salvage values and useful lives determined by the court. *Id.* at 557–58. The court then determined useful lives and salvage values of Carland's equipment using both "the taxpayer's experience" and "industry experience" over a 20-year period, and subsequently entered an order approving the Commissioner's recomputation of allowable depreciation for the years 1970–75.

On appeal Carland urges that the Tax Court erred in holding that the income forecast method of depreciation was not allowable as a matter of law. Carland urges that the proper question is whether the deductions taken were in fact "reasonable allowances" for depreciation under section 167(a). In addition, Carland argues that the Tax Court misevaluated the reasonableness of salvage value estimates made at the acquisition dates by failing to adjust them for inflation. Finally, Carland appeals the Tax Court's findings of fact regarding useful lives and salvage values.

## II. DISCUSSION

### A. Reasonableness of Depreciation Allowances

■ Section 167(a) of the Internal Revenue Code allows a deduction for a "reasonable allowance for exhaustion [and] wear and tear" of property used in the taxpayer's trade or business. Section 167(b) authorizes the use of three widely recognized depreciation methods: straight line, declining balance (commonly referred to as "double declining balance"), and sum of the

n. 8. Our own review of the record also plainly reveals that a substantial number of equipment items, especially rolling stock, continued to be used in lessees' operations well beyond 8 years.

3. *See* footnote 1.

4. Under the double-declining balance method, a uniform rate is first computed as in the straight line method, except that no salvage value is taken into account. This rate is then doubled and applied each year to the unrecovered cost (or other basis) of the asset. Although salvage value is not taken into account in computing the uniform rate, in no event may an asset be depreciated below a reasonable salvage value. *See* Treas.Reg. § 1.167(b)–2 (as amended in 1964).

years-digits. In addition, section 167(b)(4) allows the use of

> any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, *does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in paragraph (2)* [the double declining balance method] (emphasis added).

Carland relies upon section 167(b)(4) for its use of the income forecast method in this case.

We need not address the Commissioner's argument that the income forecast method is never an appropriate method for depreciating assets subject to normal wear and tear.[5] In this case it is plain that Carland's use of the income forecast method consistently resulted in unreasonable depreciation allowances which exceeded those permitted by section 167(b)(4). Thus, the Tax Court did not err in rejecting Carland's use of the income forecast method and in disallowing Carland's depreciation computations.

As the Tax Court recognized, the fundamental defect in Carland's depreciation method is that it erroneously assumes that the useful life of leased equipment is in all cases approximately equal to the primary term of the lease. This assumption might well have been correct if Carland had engaged in a regular practice of regaining possession of equipment and retiring it at the end of the primary lease term. However, the facts clearly show that Carland did not do this. Carland leased a large portion of its equipment for the full 8–year period covering both the primary *and* renewal periods.[6] In many instances Carland leased equipment for periods well beyond 8 years. Thus, there was very little correlation between the relatively short primary lease periods and the actual service lives of the leased assets. Carland's use of the income forecast method was unreasonable because it artificially shortened the cost recovery period of Carland's assets, enabling Carland to accelerate depreciation beyond what section 167(b)(4) allows.

Carland's unreasonable acceleration of depreciation can be demonstrated by applying the test of section 167(b)(4) to a unit of rolling stock, even assuming that the rolling stock had an 8–year useful life as Carland contends.[7] Computed under the double declining balance formula, the annual depreciation allowances for a $10,000 unit of rolling stock with an 8–year useful life and no salvage value would be as follows:

| Year In Service | Declining Balance Rate | Depreciation Allowance | Unrecovered Balance | Accumulated Depreciation | Accumulated Depreciation as % of Cost (Rounded) |
| --- | --- | --- | --- | --- | --- |
| Yr.1 | 25% | $2500 | $7500 | $2500 | 25% |
| Yr.2 | 25% | 1875 | 5625 | 4375 | 44% |
| Yr.3 | 25% | 1406 | 4219 | 5781 | 58% |
| Yr.4 | 25% | 1054 | 3165 | 6835 | 68% |
| Yr.5 | 25% | 792 | 2373 | 7627 | 76% |
| Yr.6 | 25% | 594 | 1779 | 8221 | 82% |

5. In a 1960 Revenue Ruling, the Commissioner approved use of the income forecast method of depreciation for television films and other similar assets that produce "strikingly uneven flow[s] of income * * * resulting from contract restrictions, methods of distribution and audience appeal of the programs." Rev.Rul. 60–358, 1960–2 C.B. 68. The Commissioner argues that use of the income forecast method should be limited to assets with these unique income-producing characteristics. Carland counters that the income forecast method is particularly suited to the equipment leasing business because the sole purpose of the assets in such a business is to produce rental income.

6. Carland effectively concedes this fact with respect to rolling stock by arguing that the proper useful life of rolling stock is 8 years. *See* Brief for Appellant at 42.

7. We use the 8–year useful life urged by Carland only for purposes of illustration. We do not mean to suggest that this is the proper useful life for Carland's rolling stock.

| Year In Service | Declining Balance Rate | Depreciation Allowance | Unrecovered Balance | Accumulated Depreciation | Accumulated Depreciation as % of Cost (Rounded) |
|---|---|---|---|---|---|
| Yr.7 | 25% | $445 | $1334 | $8666 | 87% |
| Yr.8 | 25% | 334 | 1000 | 9000 | 90% |

As this table shows, the accumulated allowances that would have resulted from applying the double declining balance formula over the the first two thirds of the asset's useful life (5.33 years) would have been equal to 76 to 82 percent of cost. By contrast, Carland's method of tying depreciation to rental income enabled it to recover over 95 percent of the asset's cost over the same length of time. When the § 167(b)(4) test is applied to other asset classes similar results appear. Therefore, the Tax Court was correct in concluding that Carland's use of income forecast method was improper.[8]

█ Carland argues, however, that it is entitled to use the elective class life system (known as the Class Life Accelerated Depreciation Range or "CLADR") authorized by section 167(m) in applying the "reasonableness" test of section 167(b)(4). Carland has submitted a comparison sheet purportedly showing that the depreciation it claims for certain types of equipment[9] is less than the amount that would have resulted from using CLADR class lives, which are shorter than the actual useful lives found by the Tax Court. Therefore, Carland urges, depreciation deductions taken for these particular assets should be deemed allowable under section 167.

The Tax Court rejected this argument on the ground that Carland had not made the election required by section 167(m), and we agree with that conclusion. Carland's argument is essentially that a taxpayer who fails to make a timely election of the CLADR system should nevertheless be entitled to benefit from that system by showing that its depreciation method produces allowances that do not exceed those that would have resulted from that system. This, however, would render section 167(m)'s election requirement meaningless. Congress authorized the CLADR system at least in part to avoid the very kind of dispute about useful lives that exists in this case. *See* H.R.Rep. No. 533, 92d Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Admin.News 1825, 1847. Because Carland failed to elect into the CLADR system it must base its depreciation method on reasonable estimates of actual useful lives; these actual useful lives must also be used in applying the § 167(b)(4) test. Accordingly, the Tax Court did not err in refusing to evaluate the reasonableness of Carland's depreciation method using the CLADR.

B. Useful Life and Salvage Value Findings

█ Having found that the Tax Court did not err in rejecting Carland's depreciation method, we must now review the Tax Court's findings of actual useful lives and salvage values.[10] We review these find-

---

8. As the Commissioner pointed out in oral argument, the Tax Court ruled that Carland was entitled to recompute all depreciation using the double declining balance method. After these recomputations were made, substantial excess depreciation still appeared on Carland's returns. This alone is strong evidence that Carland's depreciation method violated section 167(b)(4).

9. The equipment included in Carland's analysis consists of: passenger autos (class 110), light trucks (class 120), medium trucks (class 130), heavy trucks (class 140), vans, trailers, and flatbeds (class 150), and data processing equipment (class 400). Carland makes no analysis of the other classes of assets in making this argument.

10. These findings were as follows:

| Classes of Equipment | Salvage Value as a Percent of Cost |
|---|---|
| 110–140 (transportation) | 8 |
| 150 (transportation) | 25 |
| 210–260 (rolling stock) | 15 |
| 310–340 (maintenance of way) | 7 |
| 510, 519 (aircraft & components) | 50 |

ings under the clearly erroneous rule. *Dinkins v. Commissioner*, 378 F.2d 825, 828 (8th Cir.1967). The useful life of an asset for income tax purposes must be measured by its anticipated use in the taxpayer's business, not by the full abstract economic life of the asset in any business. *Massey Motors Inc. v. United States*, 364 U.S. 92, 97, 80 S.Ct. 1411, 1414–15, 4 L.Ed.2d 1592 (1960); *Dinkins*, 378 F.2d at 830. Likewise, the salvage value of an asset is not necessarily its "scrap" value; it is the amount that a taxpayer can reasonably expect to receive for the asset on resale at the end of its useful life. *Massey Motors*, 364 U.S. at 107, 80 S.Ct. at 1419. As we stated in *Dinkins:*

> It is the taxpayer's own experience and operation that serves as the guideline for the Commissioner's depreciation equation. Only if the taxpayer's experience is inadequate may the general experience in the industry be used until such time as taxpayer's own experience forms an adequate basis for determination.

378 F.2d at 830. With these standards in mind, we now turn to the specific findings challenged by Carland.

### 1. Useful Life of Maintenance–of–Way Equipment

■ Maintenance-of-way equipment includes large cranes (class 310), small cranes (class 320), ballast working machines (class 330), and a miscellany of other related equipment (class 340). The Tax Court found an average useful life of 10 years for all classes except for class 310 which it found had an average useful life of 15 years. Carland argues that these findings improperly disregard Carland's own experience, thereby violating *Massey Motors* and *Dinkins.* Carland contends that the record shows that Carland's maintenance-of-way equipment had a much shorter life, generally 3 to 5 years.

The record shows that the Tax Court findings were based on Carland's own detailed asset retirement data over a period from 1964 to 1984. Based on this data, the court found the useful life estimates made by one of Carland's witnesses unrealistic. Our review of Carland's retirement schedule reveals that of the thirteen class 310 units placed into service between 1964 and 1975 only seven were listed as being retired by 1984.[11] The average life of these seven units was approximately 12 years, with two having been held for over 16 years. The data on the other maintenance-of-way equipment shows service periods ranging from 1 to 18 years with an average of roughly 10 years. *See* Jt.App. at 988–90. In making its findings the Tax Court fully acknowledged that some of the retired equipment may not have been recorded. Based on this evidence we cannot say that the Tax Court was clearly erroneous in its

| Classes of Equipment | Salvage Value as a Percent of Cost |
|---|---|
| 500–509 (other) | 14 |

| Class of Equipment | | Useful Life in Years |
|---|---|---|
| 110 | (passenger autos) | 4 |
| 120 | (light trucks) | 5 |
| 130 | (medium trucks) | 7 |
| 140 | (heavy trucks) | 8 |
| 150 | (trailers, etc.) | 12 |
| 210–260 | (rolling stock) | 20 |
| 310 | (large cranes) | 15 |
| 320 | (small cranes) | 10 |
| 330 | (ballast working machines) | 10 |
| 340 | (other) | 10 |
| 400 | (data processing) | 10 |
| 500 | (miscellaneous) | 10 |
| 510 | (aircraft & components) | 4 |

90 T.C. at 547, 550–58.

**11.** Both parties maintain that the retirement table set out in the Tax Court's opinion, 90 T.C. at 527, contains an error. According to the parties, the column indicating the number of retirements actually shows the number of retirements up to 1975, not up to 1984 as indicated. Therefore, we base our conclusions on a reitrement schedule prepared and submitted by Carland which shows retirements through 1984. *See* Jt.App. at 974–94.

findings regarding the useful life of maintenance-of-way equipment.

## 2. Useful Life of Data Processing Equipment

The Tax Court also relied heavily on Carland's own retirement data in determining the useful life of data processing equipment. The court considered testimony of one of Carland's witnesses who estimated the useful life of this equipment to be 5 years. However, the same witness indicated that some data processing equipment remained in service for as long as 15 years. Carland argues that the court's finding of 10 years was clearly erroneous.

Again, we find no error in the Tax Court's finding. Our review of Carland's retirement schedule reveals service periods for data processing equipment ranging from 3 to 15 years, with an average of around 8 years. Approximately one-half of the items listed were kept in service for 9 to 10 years. Significantly, over two-thirds of the class 400 units placed in service from 1964 to 1975 are not listed as having been retired by 1984. *See* Jt.App. at 990–91. Based on this we cannot say that the Tax Court was clearly erroneous in finding a useful life of 10 years for Carland's data processing equipment.

## 3. Useful Life and Salvage Value of Rolling Stock

■ Carland's rolling stock is encompassed by classes 210 through 260. Class 210, which includes boxcars, flatcars, hopper cars, tank cars, gondolas, coaches, locomotives, and cabooses, is by far the largest of these classes, accounting for approximately 75 percent (in dollar terms) of the rolling stock acquired by Carland from 1964 through 1975. *See* 90 T.C. at 527. The remaining classes include traction motors, locomotive engines, alternators and generators, auto racks, and other miscellaneous equipment. The Tax Court com-

bined these classes to determine an average salvage value and useful life for rolling stock as a whole. The court found an average salvage value of 15 percent (stated as a percentage of acquisition cost) and an average useful life of 20 years.

Carland first argues that the Tax Court's salvage value determination is based on improper hindsight which looks merely at the amounts Carland actually obtained on resale, and ignores inflationary price increases that occurred from 1964 through 1975. Carland attempts to justify its lower salvage value estimates using adjustments based on the Producer Price Index for those years.

We rejected a very similar argument in *Dinkins*. There, we found evidence of general price increases in new construction equipment containing technical improvements and betterments insufficient to prove the taxpayer's contention of a general price increase in older and in some respects obsolete construction equipment. 378 F.2d at 830–31. Although we think Carland's use of the Producer Price Index falters for the same reason, we need not rest on that ground alone. Certainly, a taxpayer estimating salvage values can expect some increase in general price levels over a period of 8 to 20 years. Although the Supreme Court in *Fribourg Navigation Co. v. Commissioner*, 383 U.S. 272, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966), said that a depreciation deduction may not be denied *solely* because the asset is sold for a price above its adjusted basis, the Court did not hold, as Carland seems to argue, that salvage values must in all cases be estimated in real dollar terms.[12] Indeed, in *Fribourg* the Court found it highly significant that the high resale profit had resulted from "an unexpected and short-lived, but spectacular, change in the world market." *Id.* at 277, 86 S.Ct. at 865. Similar facts are not present here. The Tax Court therefore did not err in using Carland's actual sales profits over a 20–year period to help it

---

12. In fact, the Court in *Fribourg* said:

It is, of course, undisputed that the Commissioner may require redetermination of useful life or salvage value when it becomes apparent that either of these factors has been miscalculated. The fact of sale of an asset at an amount greater than its depreciated basis may be evidence of such a miscalculation. 383 U.S. at 277, 86 S.Ct. at 865 (citation omitted).

determine a reasonable salvage value for rolling stock.

■ Carland next argues that even if the inflation issue is disregarded the Tax Court still erred in finding a 15 percent salvage value for rolling stock. Carland points out that although its data shows an average salvage of 15.37 percent for class 210 rolling stock, the salvage it obtained for equipment in classes 230 through 260 was lower, ranging from 4.6 percent to 10 percent.

Once again, we find no error. Carland appears to be asserting that the Tax Court should have made separate salvage value findings for each class of rolling stock. Yet Carland's own retirement schedule sets forth a "group total" encompassing all rolling stock classes. *See* Jt.App. at 988. Significantly, Carland's expert witness, Mr. Cournier, also considered all Carland's rolling stock as a group in his analysis of the useful life of that equipment for the court. 90 T.C. at 554. The Tax Court decided that aggregate treatment was imperative because of the "paucity of historical data as to some type of freight cars * * *." 90 T.C. at 553. Moreover, Carland fails to explain how it was harmed to any significant extent by this averaging. As noted above, the vast majority of the rolling stock fell into class 210, which had an average salvage value of 15.37 percent. Adding the other classes with lower salvages brought the average down only to 14.7 percent. The Tax Court decided on a figure of 15 percent "based on the entire record." 90 T.C. at 547. We cannot say that this finding was clearly erroneous.

We do find error in the Tax Court's finding of a 20-year useful life for Carland's rolling stock, however. In reaching this finding the Tax Court deviated sharply from its otherwise consistent reliance on Carland's own historical experience. Although the Court relied on Carland's historical data to determine the *salvage value* for rolling stock, the court rejected *useful life* estimates based on the same historical data on the apparent ground that the data was ambiguous and could not be relied upon as a valid indicator of useful lives. *See* 90 T.C. at 556–57.[13] The Tax Court arrived at the 20-year useful life figure by relying primarily on a 1981 depreciation study prepared by Kansas City Southern Railway and L & A Railway for the Interstate Commerce Commission (ICC).[14] This study analyzed the historical service lives of rolling stock actually owned by Kansas City Southern Railway and L & A Railway—not the rolling stock that was leased to these railroads by Carland. *See* Jt.App. at 2134, 2145. Nevertheless, the Tax Court found this study highly significant because "a substantial portion of petitioner's rolling stock was in fact leased to the two railroads and presumably operated by them under conditions indistinguishable from their use of their own equipment." 90 T.C. at 555.

We think the Tax Court was too quick to reject Carland's own historical experience in determining a reasonable useful life for rolling stock. *See Dinkins*, 378 F.2d at 830. Carland is an equipment leasing company, not a railroad. Therefore, the equipment usage practices of Kansas City Southern Railway and L & A Railway, while perhaps relevant to the useful life determination, should not be systematically imputed to Carland. The importance of this point is highlighted by the fact that most of the rolling stock leased by Carland to Kansas City Southern and L & A Railway was used or remanufactured, *see* 90 T.C. at 523, whereas a large percentage of the freight cars upon which the ICC projections were based were purchased by the railroads

---

**13.** Carland's expert witness, Mr. Cournier, testified that based on a study of Carland's actual experience with rolling stock prepared by Valtec Associates, Inc. the historical useful life of Carland's rolling stock ranged from 8.75 years to 13 years. The Tax Court apparently accepted the data as an accurate reflection of Carland's past experience, but found that the data was not sufficient, or was not sufficiently analyzed, to lead to the conclusions drawn from it by Valtec Associates and Mr. Cournier. *See* 90 T.C. at 556–57.

**14.** This study employed a statistical "curve" technique to project useful lives ranging from 15 to 36 years for rolling stock owned by Kansas City Southern Railway and L & A Railway. *See* 90 T.C. at 554–56.

when new, and thus had longer useful lives than Carland's rolling stock. Moreover, Charles Caroll, the Commissioner's primary witness, made no attempt to analyze Carland's historical data. Instead, his testimony merely discussed the useful lives of various rolling stock units owned by the two railroads. Repeating the Supreme Court's caution, it is the taxpayer's own practice that determines useful life, not the full abstract economic life of the asset in any business. *Massey Motors,* 364 U.S. at 97, 80 S.Ct. at 1414–15.

Our own analysis of Carland's historical data also supports a conclusion that the Tax Court erred in its determination of the useful life of Carland's rolling stock. Carland's retirement schedule fails to reveal a single instance in which a unit of rolling stock was kept in service for 20 years or longer. Rather, the schedule shows service periods for rolling stock ranging from 1 to 18 years, with an average of approximately 11 to 12 years. Jt.App. at 985–88. Many of the units kept in service for long periods produced little or no profit on resale. Therefore, the court's finding of a 20–year useful life seems inconsistent with a 15 percent salvage. We realize, of course, that many of the units placed into service by Carland before 1975 do not appear on the retirement schedule. Yet the Tax Court itself noted that the record indicated that some of these units had actually been retired. We are simply unable to find anything in the data to support the Tax Court's finding of a 20–year useful life for Carland's rolling stock.

Based on our review of the record, we conclude that the Tax Court erred in relying too heavily on the experience of Kansas City Southern Railway and L & A Railway to determine the useful life of Carland's rolling stock and that the finding of 20 years was clearly erroneous.

## III. CONCLUSION

For these reasons, we affirm the judgment of the Tax Court in all respects except for its finding of a 20–year useful life for Carland's rolling stock. We remand the case to the Tax Court for redetermination of the useful life of the rolling stock.