ABC RENTALS OF SAN ANTONIO, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent ABC Rentals v. Commissioner
Docket Nos. 20689-91, 20690-91, 20691-91, 24840-91
United States Tax Court
T.C. Memo 1994-601; 1994 Tax Ct. Memo LEXIS 608; 68 T.C.M. (CCH) 1362; December 7, 1994, Filed *608 Decision will be entered under rule 155. For petitioners: Timothy P. O'Sullivan and John R. Gerdes. For respondent: Michael J. O'Brien. HAMBLEN
HAMBLEN
MEMORANDUM OPINION HAMBLEN, Chief Judge: By three separate notices of deficiency, respondent determined deficiencies in petitioners' income tax as follows: ABC Rentals of San Antonio, Inc. -- Docket No. 20689-91
Tax Period Ended
Deficiency
5/31/87
$  7,404.90
David R. Peters and Diana L. Peters -- Docket No. 20690-91
Tax Period Ended
Deficiency
12/31/87
$    572
12/31/88
833
John P. Parsons and Melba R. Parsons -- Docket No. 20691-91
Additions to Tax
Tax Period Ended
Deficiency
Sec. 6661 12/31/87
$ 11,028
$ 2,757
12/31/88
8,095
2,024
Respondent has conceded the additions to tax pursuant to section 6661 [2] in docket No. 20691-91 for the 1987 and 1988 taxable years in the amounts of $ 2,757 and $ 2,024, respectively. During the tax periods in issue, Guaranteed Rental Systems, Inc. (Guaranteed), was a subchapter S corporation not subject to the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 324, *609 648, [3] and all of Guaranteed's adjustments flowed directly through to the shareholders' tax returns and are reflected in the deficiencies shown in docket Nos. 20690-91 and 20691-91. For the fiscal year ending May 31, 1987, ABC Rentals of San Antonio, Inc. (ABC), was a C corporation, and the notice of deficiency in docket No. 20689-91 relates to deficiencies during that fiscal year only. Thereafter, ABC applied for and was granted S corporation status. For the tax period ending December 31, 1987, and the tax year ending December 31, 1988, ABC was a non-TEFRA subchapter S corporation, and all of ABC's adjustments flowed through to its sole shareholder, John P. Parsons, and are reflected in the deficiencies shown in docket No. 20691-91. Neither Guaranteed nor ABC is subject to the unified audit and litigation procedures originally enacted as part of TEFRA since both were small S corporations during the taxable periods in controversy for which they filed Federal S corporation income tax returns. [4]Dynamic Energy, Inc. v. Commissioner, 98 T.C. 48 (1992); Eastern States Casualty Agency, Inc. v. Commissioner, 96 T.C. 773 (1991); *610 sec. 301.6241-1T(c)(2), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 3003 (Jan. 30, 1987). *611 El Charro TV Rentals, Inc. (El Charro), is a subchapter S corporation subject to the unified audit and litigation procedures for subchapter S items under sections 6221-6233 and 6241-6245, originally enacted as part of TEFRA, as El Charro had more than 5 shareholders during each of the taxable periods in issue. On July 29, 1991, respondent mailed notices of final S corporation administrative adjustment (FSAA) to Diane L. Peters, the tax matters person (TMP) for El Charro, for El Charro's taxable years which ended on May 31, 1987, and December 31, 1988, and for its short taxable year which ended on December 31, 1987. On the schedule of adjustments attached to each FSAA, respondent partially disallowed the depreciation deductions that El Charro had claimed on its Federal income tax returns as follows: El Charro TV Rental, Inc., Diana L. Peters, Tax Matters Person --
Docket No. 24840-91
Year
Amount of Depreciation
Amount of Depreciation
Ended
Deduction Claimed Deduction Disallowed
5/31/87
$ 264,347
$  44,380
Taxable Period
6/1/87 to
12/31/87
229,395
64,668
Year
Ended
12/31/88
397,983
165,931
On October 29, 1991, Diana L. Peters, the TMP, filed a petition *612 for readjustment of S corporate items under section 6244. On January 27, 1992, these cases were consolidated. After concessions by the parties, the remaining issues for decision pertain to the use of the income forecast method of depreciation for rental units utilized in rent-to-own businesses. Background
These consolidated cases were submitted without a trial pursuant to Rule 122. The stipulation of facts and attached exhibits are incorporated by this reference and are found accordingly. Guaranteed, ABC, and El Charro (hereinafter sometimes collectively referred to as the Entities or individually referred to as an Entity) are corporations incorporated in the State of Texas with their principal offices located in Wichita, Kansas, at the time the petitions were filed in these cases. Petitioners John P. Parsons and Melba R. Parsons, resided in Goddard, Kansas, at the time the petition was filed in docket No. 20691-91, and petitioners David R. Peters and Diana L. Peters, resided in Clearwater, Kansas, at the time the petition was filed in docket No. 20690-91. During the taxable periods in controversy, Guaranteed, ABC, and El Charro were accrual basis taxpayers. Guaranteed, *613 ABC, and El Charro operated commercial enterprises which rented consumer durables (appliances, furniture, televisions, stereos, and video cassette recorders) under rent-to-own leases to individuals. All three Entities have been in the rent-to-own business for a number of years. During the tax periods in controversy, Guaranteed, ABC, and El Charro estimated that the total gross rental anticipated to be received on each rental unit (except for initial rental contracts on rental unit purchases as transfers between companies as discussed below) would be 300 percent of its initial cost. This method of determining the total gross rental anticipated to be received is consistent with the practice in the rent-to-own industry. In determining the weekly or monthly rental rate, as the case may be, for each rental unit, the Entities divided such expected total gross rental by the total number of weeks or months, as the case may be, under the initial rental contract for such rental unit. For the fiscal year ending May 31, 1987, ABC timely filed its Federal corporate income tax return, and El Charro timely filed its Federal corporate income tax return for an S corporation. ABC timely filed *614 a valid subchapter S election, and the election was granted effective June 1, 1987. Guaranteed timely filed its Federal corporate income tax return for an S corporation for the calendar year ending 1987, and ABC and El Charro timely filed their Federal corporate income tax returns for an S corporation for the short taxable period ending December 31, 1987. Guaranteed, ABC, and El Charro timely filed their Federal corporate income tax returns for S corporations for the calendar year 1988. Whenever a rental unit either was picked up by an Entity or returned to that Entity prior to all payments being made under the initial rental contract, due either to a failure of the customer to timely pay periodic rent or the exercise by the customer of the customer's rights to return the rental unit at any time, normally a subsequent rental contract, having the same provisions and weekly or monthly rental payment as the initial rental contract, would be executed with another customer. [5] *615 During the tax years in issue, each Entity periodically sold or purchased rental units to or from the other Entities at the selling Entity's book value. [6]
Rental units ceased to be in an Entity's depreciable rental inventory upon the occurrence of the following events: (1) Customers retaining rental units for the full term of the rental contract; (2) customers electing the early purchase option thereunder; (3) selling or junking substantially damaged rental units which were returned to an Entity by customers; (4) theft of the rental units; and (5) transfers between one Entity and the other Entities. When any of the units ceased to be in an Entity's depreciable rental inventory, the remaining basis was either "charged off" or used to determine gain or loss from the disposition. On their income tax returns ending *616 in 1987 and 1988, the Entities continued to depreciate all rental units placed in service during prior tax years, using the accelerated cost recovery system (ACRS). The recovery period used by the Entities to calculate the depreciation under ACRS was 5 years. For Federal income tax purposes, the Entities calculated depreciation on their rental units placed in service for tax years ending after 1986 using the income forecast method. [7] On rental units initially acquired by an Entity through purchase from third parties and rented for the first time and for rental units rented by an Entity on a subsequent rental contract, each year's depreciation deduction was equal to the cost of the rental units multiplied by a fraction. The numerator of the fraction was the current year's income from that rental unit. The denominator of the fraction was 300 percent of the rental unit's initial cost, which was the amount of total gross rental that would be received if the initial rental contract on such rental went to term. *617 The total initial cost of rental units acquired during the years 1987 and 1988 and which remained in Guaranteed's rental inventory as of the end of the years was $ 142,173.71 and $ 117,812.45, respectively. The total initial cost of rental units acquired during the tax years ending May 31, 1987, December 31, 1987, and December 31, 1988, and which remained in El Charro's rental inventory as of the end of the years was $ 560,710.92, $ 213,862.11, and $ 442,448.12, respectively. The total initial cost of rental units acquired during the tax years ending May 31, 1987, December 31, 1987, and December 31, 1988, and which remained in El Charro's rental inventory as of the end of the years was $ 273,435.20, $ 137,102.89, and $ 328,557.04, respectively. During the taxable periods in controversy, Guaranteed's stock was owned as follows: Latama K. Brown (45 percent), Joseph C. Parsons (22.5 percent), John P. Parsons (22.5 percent), and Diana Peters (10 percent); El Charro's stock was owned as follows: John P. Parsons (40.30 percent), Joseph C. Parsons (22.70 percent), Latama K. Brown (10 percent), Diana L. Peters (3.96 percent), Marcia A. Nester (3.96 percent), Twyla L. Thomas (3.96 percent), *618 Kimberly A. Loney (3.96 percent), Richard C. Parsons (3.96 percent), Carl D. Parsons (3.60 percent), and Jeffery W. Parsons (3.60 percent); and ABC's stock was entirely owned by John P. Parsons (100 percent). Guaranteed, ABC, and El Charro have compiled detailed experience data with respect to their rental units during the 1991 and 1992 calendar years. Guaranteed, ABC, and El Charro's business operations and surrounding market conditions have remained essentially unchanged from the years at issue throughout the years in which such experience data was derived. Due to such continuity, the parties submit that (assuming the actual data as to Guaranteed, ABC, and El Charro was available for the tax years in question) the data, if delineated, would not vary materially from the experience data delineated from 1991 and 1992. Respondent contends that the 1991 and 1992 experience data is irrelevant to the issues before the Court, which are whether or not ABC, El Charro, and Guaranteed may use the income forecast method of depreciation to depreciate appliances, televisions, furniture, stereos, and video cassette recorders. Each Entity's 1991 and 1992 experience data indicates that the average *619 total number of rental contracts entered into, per category of rental units, from an Entity's initial date of purchase of such rental units to the date of disposal, was as follows: Number of Rental Contracts
Category
Guaranteed
El Charro
ABC
Appliances
3.1
2.7
3.1
Televisions
3.6
3.2
3.4
Furniture
2.2
1.8
1.9
Stereos
2.1
2.4
2.5
Video cassette recorders
3.0
3.5
3.8
Each Entity's 1991 and 1992 experience data indicates that the percentage of rental units, per category of rental units, which were disposed of to customers pursuant to the provisions of the initial rental contract on such rental units, by virtue of the customers' either retaining rental units for the full term of the initial rental contract or electing the early purchase option thereunder, was as follows: Percentage
Category
Guaranteed
El Charro
ABC
Appliances
32%
36%
44%
Televisions
15
29
30
Furniture
39
39
44
Stereos
32
25
39
Video cassette recorders
28
32
34
While the term of the initial rental contract on any rental unit would depend on the category of the rental unit, virtually all of the Entities' rental units had initial rental contract terms of *620 12, 15, 18, 19, 20, or 21 months. Each Entity's 1991 and 1992 experience data indicates that the percentage of rental units which were initially rented out for each such term was as follows: Percentage
Initial Term
Guaranteed
El Charro
ABC
12 months
28%
25%
26%
15 months
12
12
13
18 months
36
44
41
19 months
7
4
5
20 months
6
5
4
21 months
11
9
10
Each Entity's 1991 and 1992 experience data indicates that, per category of rental units, the actual average total amount of gross rental it received under all rental contracts for a rental unit in such category was the product of the initial cost to an Entity of such rental unit times the following delineated integer: Integer
Category
Guaranteed
El Charro
ABC
Appliances
3.1
3.3
3.2
Televisions
2.8
3.3
3.0
Furniture
2.9
3.0
2.6
Stereos
2.7
3.2
3.0
Video cassette recorders
2.9
3.5
3.4
An integer of 3.0 represents a gross return of 300 percent of initial cost. Each Entity's 1991 and 1992 experience data indicates that, per category of rental units consisting of all rental units having the same initial term, the average number of months it received rental payments (months *621 rented) and the average number of months, including idle time, from each Entity's initial date of purchase to disposal (duration in inventory) for a rental unit under each initial rental term was as follows: Guaranteed El Charro
ABC
Duration
Duration
Duration
Months in
Months in
Months in
Initial Term
Rented Inventory Rented Inventory Rented Inventory 12 months
13.2
20.3
13.6
19.0
12.6
18.8
15 months
15.8
19.3
19.1
20.9
18.0
20.5
18 months
20.8
23.8
21.2
23.0
21.0
23.6
19 months
17.0
19.8
17.1
19.2
17.3
20.3
20 months
17.8
19.5
18.5
19.4
18.1
20.1
21 months
21.3
25.4
21.9
25.6
21.6
26.2
Respondent determined that petitioners had improperly used the income forecast method of depreciation to calculate depreciation deductions for the rental property used in petitioners' rent-to-own businesses. Respondent contends that the income forecast method of depreciation is not an approved method for depreciating assets other than television films, tape shows for reproduction of motion picture films, sound recordings, and other property of similar character. Respondent further contends that the rental *622 units on which petitioners have used the income forecast method of depreciation do not meet the test for being similar in character to property for which the income forecast method of depreciation has been approved. Specifically, respondent contends that: (1) The corporate taxpayers herein failed to file elections pursuant to section 168(f)(1) to change their method of depreciation to the income forecast method for the assets placed in service for taxable years ending in 1987, [8] (2) regardless of whether section 168(f)(1) elections were filed, the income forecast method of depreciation is not allowable for the kinds of property utilized in the taxpayers' rent-to-own businesses (i.e., furniture, appliances, televisions, stereo equipment, and video tape recorders), and (3) the corporate taxpayers herein improperly applied the income forecast method when calculating depreciation deductions because they failed, inter alia, to take into account the rental units' salvage value. *623 Petitioners contend that: (1) They filed valid elections pursuant to section 168(f)(1) to exclude their rental units from the otherwise mandatory provisions of the modified accelerated depreciation system (MACRS), (2) the rental units utilized in their rent-to-own business are properly depreciable under the income forecast method of depreciation, and (3) the corporate entities properly applied the income forecast method of depreciation when calculating depreciation deductions. Because we hold that petitioners have failed to demonstrate that the rental units utilized in their rent-to-own businesses constitute property which is properly depreciable under the income forecast method of depreciation, we need not discuss respondent's contentions relating to whether petitioners filed elections under section 168(f)(1) to exclude property from the mandatory provisions of MACRS, and whether petitioners improperly applied the income forecast method of depreciation to calculate depreciation deductions. Discussion
Petitioners bear the burden of proving that respondent's determinations set forth in the respective notices of deficiency and FSAA's are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). *624 Accordingly, the burden of proof with respect to the propriety of the income forecast method of depreciation used by Guaranteed, ABC, and El Charro to depreciate their leased consumer durables is on petitioners. Reinberg v. Commissioner, 90 T.C. 116, 141 (1988). Guaranteed, ABC, and El Charro used the income forecast method of depreciation to compute the depreciation deduction for their leased assets placed in service during the tax years ending in 1987 and 1988 (Guaranteed -- December 31, 1987, and December 31, 1988; ABC -- May 31, 1987, December 31, 1987, and December 31, 1988; and El Charro -- May 31, 1987, December 31, 1987, and December 31, 1988). Virtually all of the Entities' consumer durables had initial rental contract terms of 12, 15, 18, 19, 20, or 21 months. The annual depreciation of an asset was determined by multiplying the cost of such leased asset by a fraction, the numerator of which was the rental income received with respect to such asset for the taxable year, and the denominator of which was the total rental income anticipated over the leases, which was always assumed to be equal to 300 percent of the asset's cost. No adjustment *625 was made for salvage value when determining the cost of the asset. Respondent determined that the income forecast method may not be used to compute allowable annual depreciation under the applicable statute for the particular assets here involved. Section 167(a) provides that a taxpayer shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion and wear and tear of property used in the trade or business or held for the production of income. Section 167(a) further provides that the deduction allowable under section 168 shall be deemed to constitute the reasonable allowance provided by section 167(a). Section 168(a) provides that, except as otherwise provided in section 168, the depreciation deduction provided by section 167(a) for any tangible property shall be determined by using the applicable depreciation method, recovery period, and convention for such property. The rental units placed in service by Guaranteed, ABC, and El Charro have a class life of 9 years, based on the asset guideline class 57.0. Rev. Proc. 87-56, 1987-2 C.B. 674, 686. Assets having a 9-year class life are treated as 5-year property *626 under section 168(e), and the applicable recovery period is 5 years as computed under MACRS pursuant to section 168(c). The parties agree on the applicable recovery period and the applicable convention to be used if section 168 applies in this case. However, section 168(f) provides certain exclusions for property to escape the otherwise mandatory provisions of section 168. The question is whether the exception in section 168(f)(1) is applicable. Specifically, section 168(f)(1) provides: SEC. 168(f). Property To Which Section Does Not Apply -- This section shall not apply to -- (1) Certain Methods of Depreciation. -- Any property if -- (A) the taxpayer elects to exclude such property from the application of this section, and (B) for the 1st taxable year for which a depreciation deduction would be allowable with respect to such property in the hands of the taxpayer, the property is properly depreciated under the unit-of-production method or any method of depreciation not expressed in a term of years (other than the retirement-replacement-betterment method or similar method). [Emphasis added.]
A taxpayer must comply with the requirements of section 168(f)(1) *627 before it may use the income forecast method of accounting to calculate its depreciation deductions. Sec. 168(f)(1). Not only must the taxpayer make a valid and proper election pursuant to section 168(f) (1)(A) for the first year in which the property is placed in service, but the property must be properly depreciated under a unit-of-production method or any method of depreciation not expressed in a term of years. Id.; Rev. Proc. 87-57, 1987-2 C.B. 687; see also sec. 5h.5(a), Temporary Income Tax Regs., 52 Fed. Reg. 3623 (Feb. 5, 1987). The income forecast method is a method of depreciation not expressed in a term of years. Consequently, the question we must address is whether the consumer durables leased under rent-to-own contracts are properties properly depreciable under the income forecast method. Petitioners bear the burden of proof with respect to this issue. Rule 142(a); Welch v. Halvering, supra; Reinberg v. Commissioner, supra.
The income forecast method was first employed to depreciate films due to the uneven flow of income generally produced by *628 television films. In recognition of the special circumstances involved with television films, the Commissioner issued Rev. Rul. 60-358, 1960-2 C.B. 68, allowing depreciation expenses to be calculated on a formula based upon the forecast of future income because in most cases the time-based methods of depreciation described in section 167(b) of the Internal Revenue Code of 1954 were inadequate when applied to films. In Rev. Rul. 60-358, supra, the Commissioner determined that the usefulness of the television film in a taxpayer's trade or business was more accurately measured over the stream of income it produced than over the passage of time alone. The ruling explicitly stated that the income forecast method was "limited in its application to television films, taped shows for reproduction and other property of similar character." Rev. Rul. 60-358, 1960-2 C.B. at 70 (emphasis added). The application of the income forecast method has been approved by this Court in several cases involving films. See, e.g., Abramson v. Commissioner, 86 T.C. 360 (1986); *629 Greene v. Commissioner, 81 T.C. 132 (1983), Wildman v. Commissioner, 78 T.C. 943 (1982). In relevant part, Rev. Rul. 60-358, supra, states as follows: the methods of computing depreciation described in section 167(b) of the Code are in most cases inadequate when applied to television films, resulting in a distortion of income on the returns filed by taxpayers deriving income from such films. This distortion is caused by a strikingly uneven flow of income, earned by groups of programs within the series, resulting from contract restrictions, methods of distribution and audience appeal of the programs. If the film series is a success, additional income will be forthcoming from reruns over a period of years, depending upon its popularity; whereas, unsuccessful film series may produce little or no income after the initial exhibition. Thus the usefulness of such assets in the taxpayer's trade or business is measurable over the income it produces and cannot be adequately measured by the passage of time alone. Therefore, in order to avoid distortion, depreciation must follow *630 the "flow of income." * * * the Service has concluded that the so-called "income forecast" method is readily adaptable in computing depreciation of the cost of television films without producing any serious distortion of income. This method requires the application of a fraction, the numerator of which is the income from the films for the taxable year, and the denominator of which is the forecasted or estimated total income to be derived from the films during their useful life, including estimated income from the foreign exhibition or other exploitation of such films. The term "income" for purposes of computing this fraction means income from the films less the expense of distributing the films, not including depreciation. This fraction is multiplied by the cost of films which produced income during the taxable year, after appropriate adjustment for estimated salvage value. * * * [ Rev. Rul. 60-358, 1960-2 C.B. at 68-69.]
In Rev. Rul. 64-273, 1964-2 C.B. 62, the Commissioner amplified Rev. Rul. 60-358, supra, by authorizing the income forecast *631 method with respect to motion picture films, and the Tax Court has approved this application. Schneider v. Commissioner, 65 T.C. 18, 32-33 (1975). In Rev. Rul. 74-358, 1974-2 C.B. 43, the Commissioner stated that amounts paid in advance by a television station for the right to exhibit films under a contract permitting limited exposure for a limited period of time are expenditures subject to an allowance for depreciation of intangible assets under section 167, I.R.C. 1954. In Rev. Rul. 79-285, 1979-2 C.B. 91, the Commissioner approved the use of the income forecast method in depreciating books, patents, and master sound recordings because such property produces income in a manner similar to motion picture and television films. In Rev. Rul. 89-62, 1989-1 C.B. 78, the Commissioner allowed video cassettes to be depreciated using either the straight line method or the income forecast method. In Carland, Inc. v. Commissioner, 909 F.2d 1101 (8th Cir. 1990), affg. on this issue 90 T.C. 505 (1988), *632 the Court of Appeals for the Eighth Circuit affirmed the Tax Court's holding that a taxpayer's use of the income forecast method of depreciation for certain leased equipment was improper as it resulted in an unreasonable acceleration of depreciation. The assets being depreciated by the income forecast method were railroad rolling stock of various categories, automotive equipment, aircraft, railroad maintenance-or-way equipment, and data processing equipment. In Carland, Inc. v. Commissioner, 90 T.C. at 545, we concluded that The attributes inherent in a film property which made the traditional useful life concepts inapplicable simply do not apply to the categories of assets which concern us here. The usefulness of such assets is, in our view, adequately measured by the passage of time and we perceive no conceivable justification whatever for turning to the income-forecast method which keys the useful life of the asset to the income produced. * * *
We believe that this principle is equally applicable in the present case. The Court of Appeals in Carland, Inc, v. Commissioner, supra, did not find it necessary to approve or disapprove *633 that principle. The court stated: We need not address the Commissioner's argument that the income forecast method is never an appropriate method for depreciating assets subject to normal wear and tear. In this case it is plain that Carland's use of the income forecast method consistently resulted in unreasonable depreciation allowances which exceed those permitted by section 167(b)(4). * * * [909 F.2d at 1104; fn. ref. omitted.]
Carland, Inc. v. Commissioner, supra, was decided for a tax year prior to the enactment of ACRS and MACRS; thus, the elective provisions subsequently provided in sections 168(e)(2), I.R.C. 1954, and 168(f)(1) were not at issue. The issue there was the reasonableness of the taxpayer's depreciation method under section 167(a). During the years at issue in this case, however, before one can determine the reasonableness of depreciation under section 167(a), one has to escape from the mandatory provisions of section 168. Petitioners contend that the clear statutory language of section 168(f)(1) permits any type of property otherwise qualifying under MACRS to use the income forecast method. We disagree. We find *634 that the section 168(f)(1) election is available for the property in question only if it is properly depreciated under the income forecast method of accounting. Thus a proper election pursuant to section 168(f)(1) must be timely filed, and the property must be property properly qualifying for depreciation under the income forecast method. As a result, it is appropriate to look at pre-1986 legislation and case law, including Carland, Inc. v. Commissioner, supra, to determine what property properly qualifies for depreciation under the income forecast method. The Supreme Court stated in Massey Motors, Inc. v. United States, 364 U.S. 92, 104 (1960), that "it is the primary purpose of depreciation accounting to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use (excluding maintenance expense) of the asset to the periods to which it contributes." The taxpayer in Massey Motors was in the trade or business of leasing automobiles. Id. at 94. Due to its customers' demand for newer models, the taxpayer typically used the automobiles in its trade or *635 business for a period of 15 months and then disposed of them. The Court held that the useful life of the automobiles for depreciation purposes was not their "full" economic life (4 years, as claimed by the taxpayer) but only the shorter period during which they could reasonably be expected to be employed in the taxpayer's business. Id.
As was the case in Massey Motors and for all taxpayers prior to 1971, the useful life of property in the taxpayer's trade or business was a facts and circumstances determination based on the taxpayer's own experience. In 1971, in an effort to minimize disputes concerning such determination of useful life, Congress added new section 167(m), which authorized the Commissioner to determine class lives under an asset depreciation range (ADR) system. Revenue Act of 1971, Pub. L. 92-178, sec. 109(a), 85 Stat. 497, 508. An annual allowance of depreciation determined under the ADR system was deemed a "reasonable allowance" under section 167(a). If the Commissioner had not established a class life for the taxpayer's business or if the taxpayer did not elect to depreciate his property under section 167(m), the useful life for such taxpayer's property *636 continued to be determined on a facts and circumstances basis. In 1981, Congress adopted the accelerated cost recovery system (ACRS) by adding section 168. Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, sec. 201(a), 95 Stat. 172, 203. Section 168(a) provided: "There shall be allowed as a deduction for any taxable year the amount determined under this section with respect to recovery property." [9] ERTA sec. 201(a), 95 Stat. 204. Under section 168(c)(1), the term "recovery property" included most tangible property used in a trade or business. ERTA sec. 201(a), 95 Stat. 206. Correspondingly, section 167(a) was amended to provide that "In the case of recovery property (within the meaning of section 168), the deduction allowable under section 168 shall be deemed to constitute the reasonable allowance provided by this section". ERTA sec. 203(a), 95 Stat. 221. *637 Under ACRS, a taxpayer could depreciate the entire cost of property used in his trade or business without regard to salvage value. ERTA sec. 201(a), 95 Stat. 216. Property was assigned to one of a limited number of recovery periods based on the class life which had been established by the Commissioner for such property under the ADR system. ERTA sec. 201(a), 95 Stat. 206-207, 217. For all eligible property not having a class life, a singular recovery period was prescribed. ERTA sec. 201(a), 95 Stat. 206-207. Congress authorized the Internal Revenue Service (the Service) to prescribe a class life for property that did not have a class life under the ADR system, provided such class life reasonably reflected the anticipated useful life of such property to the industry or business. ERTA sec. 201(a), 95 Stat. 217; see Rev. Proc. 83-35, 1983-1 C.B 745. The net effect of the 1981 legislation was that ACRS depreciation under section 168 became mandatory for most tangible depreciable assets placed in service after 1980. However, section 168(e)(2) provided the following exception: SEC. 168(e)(2). Certain Methods of Depreciation. -- The *638 term "recovery property" does not include property if -- (A) the taxpayer elects to exclude such property from the application of this section, and (B) for the first taxable year for which a deduction would (but for this election) be allowable under this section with respect to such property in the hands of the taxpayer, the property is properly depreciated under the unit-of-production method or any method of depreciation not expressed in a term of years (other than the retirement-replacement-betterment method). [ERTA sec. 201(a), 95 Stat. 208.]
Congress achieved two objectives with the enactment of ACRS. First, Congress desired to simplify the system by codifying recovery periods based on class lives under the ADR system and, in instances where no class life existed for a given business under the ACRS system, to allow the Commissioner to establish a class life which reasonably reflected the anticipated useful life of the property to the business. ERTA sec. 201(a), 95 Stat. 217. Secondly, ACRS was intended to provide a substantial economic stimulus to a majority of taxpayers by accelerating recovery periods over what had previously been the case. See Simon v. Commissioner, 103 T.C. 247 (1994); *639 S. Rept. 97-144, at 48 (1981), 1981-2 C.B. 412, 425; H. Rept. 97-201, at 66 (1981). In 1984, Congress added section 168(e)(5) to clarify that motion picture films and video tapes were not eligible for accelerated depreciation under ACRS. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 113(b)(1), 98 Stat. 494, 636. In discussing the exception under section 168(e)(5), the Senate Finance Committee report to the 1984 legislation stated: Under section 168(e)(2), for depreciation purposes, recovery property does not include depreciable personal property which the taxpayer elects to depreciate under the unit-of-production method, the income forecast method or certain other methods of depreciation not expressed in a term of years. Under the income forecast method, a taxpayer can deduct in any taxable year that portion of its basis in property computed by multiplying the basis by a fraction the numerator of which is the income derived from the property in that year and the denominator of which is all the income which the taxpayer reasonably expects to derive from the property. [S. Prt. 98-169, at 467 (1984).]
In 1986, Congress substantially revised *640 and modified section 168 by adopting MACRS. Tax Reform Act of 1986, Pub. L. 99-514, sec. 201(a), 100 Stat. 2085, 2121. Congress specifically provided that motion picture films and video tapes were excluded from using the accelerated depreciation provided under section 168, just as such property had been precluded from using ACRS by the aforementioned 1984 legislation. Sec. 168(f)(3). Additionally, Congress precluded sound recordings from using the accelerated depreciation under section 168. Sec. 168(f)(4). As was the case with ACRS, the methods of depreciation provided pursuant to section 167 were generally inapplicable to property eligible for MACRS. As discussed above, MACRS contains section 168(f)(1), the exception which was previously under section 168(e)(2) of ACRS, but the reference was changed from "recovery property" to "any property". The legislative history surrounding the enactment of section 168(f)(1) sheds little light on the type of property that can be properly depreciated under a method of depreciation not expressed in a term of years. No specific references to the income forecast method of depreciation were made in the conference committee report to section *641 168(f)(1). [10]
We hold that petitioners have failed to demonstrate that the consumer durables leased in their rent-to-own business constitute property properly depreciated under the income forecast method of depreciation. It is clear that the consumer durables in this case are not *642 property similar in character to the assets which have been allowed to use the income forecast method of depreciation. The underlying theory of the income forecast method is that the useful life of certain assets of an artistic or creative character does not depend on physical wear or tear or the mere passage of time, but rather the vagaries of public taste. Consequently, an estimate is made of the total income expected to be derived from such an asset throughout its projected lifetime in the business. The depreciation for a given year is then allocated based on the net income actually earned in that year. In this case, however, the consumer durables were leased for fixed terms, and the income stream produced by these assets was relatively steady, unlike that of the television films described in the Commissioner's revenue rulings. See supra pp. 17-18. We recognize that the Entities may rent the consumer durables to several different consumers before the rental unit is disposed of, but the Entities' own evidence shows how constant and how accurately they were able to predict the rate and total income received from each asset. The Entities estimated that the total income *643 would be 300 percent of cost in all cases, and the parties have stipulated that this is the practice in the industry. We find it anomalous that the Entities are contending that these assets, for which they have been able to project the total income they will produce, are like television and movie films. Because of the unpredictability of income from and the highly speculative nature of the assets typically depreciated under the income forecast method, taxpayers using this method for depreciation have frequently had trouble making reasonable estimates of the lifetime income potential of the depreciable property in question. See, e.g., Abramson v. Commissioner, 86 T.C. 360 (1986); Sheid v. Commissioner, T.C. Memo. 1985-402; Bizub v. Commissioner, T.C. Memo. 1983-280. Unlike assets typically depreciated under the income forecast method, which generate uneven flows of income and have unique income producing potential, we find none of these inherent characteristics present in these leased consumer durables. The leased consumer durables do not resemble the assets for which the income forecast *644 method of depreciation has been allowed. For example, if a film is a success, additional income will be forthcoming from reruns over a period of years, whereas an unsuccessful film may produce little or no income after the initial exhibitions. See Rev. Rul. 60-358, 1960-2 C.B. 68. For these reasons, among others, it was difficult, if not impossible, to properly match depreciation deductions to the useful life of such assets where depreciation could not be reliably measured merely by the passage of time. In contrast, petitioners' own evidence demonstrates how steady and dependable the flow of income was from each of the leased assets. In the instant case, Guaranteed, ABC, and El Charro may well dispose of the subject assets in less than the 5-year recovery period mandated by MACRS. However, when they dispose of any such asset, they are allowed to charge off the remaining basis of that asset. Thus, the Entities' contention regarding the shortened useful life of such assets is not a valid argument to avoid MACRS depreciation mandated by section 168. Moreover, petitioners have failed to cite any substantive authority to support their position *645 that the income forecast method may be properly used for the tangible personal property in question here (i.e., appliances, television, furniture, stereos, and video cassette recorders). Petitioners contend that it is common practice in the rent-to-own industry to use the income forecast method of depreciation. However, the industry practice, if there is such, of using the income forecast method is not controlling. Section 168 provides in part that tangible personal property is properly depreciated over the applicable recovery period. Where a taxpayer makes an election pursuant to section 168(f)(1), the Commissioner determines that the elected method is improper, the taxpayer bears the burden of proof with respect to the issue that the useful life of the property is properly measured under the unit-of-production method or any other method not expressed in terms of years (including the income forecast method). In view of the even flow of income earned by these assets, and because the useful life of these assets is accurately measured by the passage of time and ordinary wear and tear, we hold the income forecast method of depreciation is not appropriate or applicable in this case *646 as it produces a distortion of income and does not further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use of the asset to the periods to which it contributes. We, therefore, hold that petitioners have not met their burden of proof with respect to the depreciation deductions claimed during the taxable years in issue. Consequently, we sustain respondent's determinations. As we previously stated, because we hold that petitioners have not demonstrated that the consumer durables leased in their rent-to-own businesses are properly depreciated by using the income forecast method of accounting, we need not address respondent's alternative contentions. We have considered all other arguments made by petitioners and find them to be without merit. To reflect the foregoing and concessions by the parties, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: David R. Peters and Diana L. Peters, docket No. 20690-91; John P. Parsons and Melba R. Parsons, docket No. 20691-91; and El Charro TV Rental, Inc., Diana L. Peters, Tax Matters Person, docket No. 24840-91.↩
2. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Sec. 6244 provides that the TEFRA provisions relating to the assessment and determination of partnership items are extended to the assessment and determination of subch. S items. Sec. 301.6241-1T(c), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 3003↩ (Jan. 30, 1987), exempts small S corporations, defined as corporations with 5 or fewer shareholders, from the unified audit and litigation procedures for taxable years the due date of the return of which is on or after Jan. 30, 1987.
4. While a small S corporation may make an election under sec. 301.6241-1T(c)(2)(v)(A), Temporary Proced. & Admin. Regs., supra↩, to have the tax treatment of corporate items determined at the corporate level rather than at the shareholder level, neither Guaranteed nor ABC made such an election in this case.
5. The term of the subsequent rental contract would be adjusted, when so required, according to the Entity's internal schedule. This internal schedule might require a reduction in the term of the lease depending upon the number of days the rental unit had been previously rented. In a small minority of circumstances, the weekly or monthly rental payments also would be reduced under the subsequent rental contract on returned rental units which had sustained a diminished value beyond normal wear and tear. Normally this procedure would continue to be followed until a customer retained the rental unit for the full term of the rental contract.↩
6. The Entities used the straight line method of depreciation for book purposes with an 18-month useful life to depreciate all of the rental units. Such transfers between Entities were not made for tax reasons, but for the purpose of transferring rental units to maximize their income potential. The term of the rental contract of the rental units so purchased, which had been previously rented by the selling Entity, was adjusted accordingly.↩
7. Under the income forecast method used by the Entities, a rental unit's depreciation deduction was based on the rent received on that rental unit. Consequently, a depreciation deduction was not taken on a rental unit during any month in which it did not earn rental income.↩
8. The parties have stipulated that the Entities have filed elections pursuant to sec. 168(f)(1)↩ to select the income forecast method of depreciation for the tax years ending Dec. 31, 1988. While respondent does not contest the form or timing of these elections, she does contest whether the rental units being depreciated by the Entities qualify for using an income forecasting method of depreciation.
9. In 1981, Congress also enacted sec. 167(m)(4), which provided that sec. 167(m) shall cease to "apply with respect to recovery property (within the meaning of section 168↩) placed in service after December 31, 1980." Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 203(b), 95 Stat. 172, 221.
10. The conference committee report stated, in pertinent part, as follows: As under present law, property which the taxpayer properly elects to depreciate under the unit-of-production method or any other method not expressed in terms of years (other than the retirement-replacement-betterment method or similar method), will be so depreciated. For example, depreciation is allowable with respect to landfills on a unit basis (without regard to whether the space for dumping waste was excavated by the taxpayer), to the extent capital costs are properly allocable to the space to be filled with waste rather than to the underlying land. [H. Conf. Rept. 99-841 (Vol. 2), at II-40 (1986), 1986-3 C.B. (Vol. 4) 1, 40.]↩